[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-16602

_____

D.C. Docket No. 1:12-cr-20276-FAM-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANIEL MACK,
OCTAVIUS MCLENDON,
HENRY LEE BRYANT,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(July 24, 2014)

Before MARCUS, Circuit Judge, PROCTOR,[*] and EVANS,[**] District Judges.

---

[*]The Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

[**]The Honorable Orinda D. Evans, United States District Judge for the Northern District of Georgia, sitting by designation.

EVANS, District Judge:

Defendants/Appellants (hereinafter "Defendants") Daniel Mack ("Mack"), Henry Lee Bryant ("Bryant"), and Octavius McLendon ("McLendon") were convicted of, inter alia, conspiracy to possess with intent to distribute five kilograms or more of cocaine and possession of a firearm in furtherance of a drug trafficking crime. They appeal, raising numerous issues related to their convictions. Bryant also appeals his sentence. We affirm.

## I. Background

### A.    The Evidence

The following is the evidence construed in the government's favor.[1]  United States v. Harris, 20 F.3d 445, 452 (11th Cir. 1994) (citation omitted).

In 2011, the Federal Bureau of Investigation (the "FBI") initiated an investigation in Miami Beach, Florida. As part of that investigation, undercover FBI agent Dante Jackson ("Agent Jackson") posed as "Kevin Johnson," the general manager of a Miami Beach nightclub called Dolce UltraLounge ("Dolce"). While acting as the nightclub manager, Agent Jackson was introduced to Defendant Bryant, a veteran Miami Beach fire inspector.

---

[1]Much of the evidence was recorded, and the recordings were played for the jury.

During a meeting at the nightclub office on December 2, 2011, Agent Jackson told Bryant that he was helping a drug-trafficker friend from New York by transporting drugs. Agent Jackson proposed a plan to move some of the friend's drugs from the Miami Beach nightclub to the Aventura Mall in north Miami-Dade County, and asked Bryant whether he could provide police protection for the transport. Jackson specifically insisted that the officers be in uniform and drive marked police cruisers to avoid interdiction by other law enforcement.

On December 4, 2011, Bryant told Agent Jackson that he had "four County guys" and "two Beach guys" who would escort the drugs. He added that he would bring in Defendant McLendon, to whom Bryant referred as his "brother." Bryant described McLendon as "the point man" who would communicate the plans to the officers.

On December 6, 2011, Agent Jackson called Bryant and attempted to arrange a meeting with the officers who had been enlisted by Bryant to provide the escort. Bryant did not bring his "guys" to his follow-up meeting with Jackson that took place on December 9, 2011; however, he assured Agent Jackson in a recorded conversation that "[the police officers] gonna know what's gonna on, cause [Bryant was] gonna tell them [what the deal was] straight up." Bryant also

3

commented that he and McLendon had been "in this thing together for, since [they]'ve been eight years old."

Agent Jackson and Bryant had several additional conversations in which they discussed the details of the transportation of the drugs. During a telephone call on December 10, 2011, Agent Jackson referred to the "dope" that they would be transporting, and Bryant immediately hung up. Later, Bryant reprimanded Jackson stating he had thought that Jackson had said "coke." Bryant instructed Jackson not to use the word "coke" over the telephone because their conversations could be intercepted by law enforcement.

December 21, 2011 was the date of the first of two drug transportation trips. On that day, Agent Jackson introduced Bryant to his drug-trafficking friend from New York, who was played by Detective KayTee Tyson ("Det. Tyson"), at a restaurant on South Beach. At approximately 4:30 p.m. that afternoon, Bryant, accompanied by McLendon, arrived at Dolce to collect the cocaine.[2] Agent Jackson and Det. Tyson were present in their undercover roles.

Bryant and McLendon began discussing the route that they were going to take. McLendon stated that they should not use the SunPass toll lane, and Bryant clarified that this was because the camera on the toll lane takes pictures. Det.

---

[2]That meeting was video recorded.

4

Tyson then told Bryant and McLendon that "there's nine in there," referencing the quantity of cocaine in kilograms, and stated that "we need to make sure that all nine of these get there."  McLendon nodded his head in agreement.  Det. Tyson added, "cause this money, see what I'm saying?"

In front of both Bryant and McLendon, Det. Tyson then marked each of the nine packaged bricks of sham cocaine with a marker, and Agent Jackson placed the packages into a duffel bag.  After Bryant and McLendon counted or partially counted the nine kilograms of sham cocaine, Det. Tyson told them that there may be "no deviation, no taste, no test," and asked if either of them "get high?"  According to Det. Tyson, they appeared to be insulted and McLendon made a sound as though he was upset with the question.

FBI agents on the ground and in a surveillance aircraft observed Bryant and McLendon driving away from the nightclub.  Bryant and McLendon's vehicle drove to Aventura Mall.  Their vehicle was escorted by a marked police patrol car with the numbers 1929A painted on its roof.  There is no express evidence as to who was driving that vehicle, but the patrol car was assigned to Defendant Mack.[3]

---

[3]The government and Defendant Mack stipulated that vehicle number 1929A was assigned to Mack.

5

Mack's vehicle kept going past the mall and did not reappear. Bryant was paid $10,500 for the job.

On the morning of January 14, 2012, the date of the second drug transportation trip, the undercover agents met with Bryant and Defendant Mack at a restaurant. Mack had been a police officer with the Miami-Dade police department for sixteen years. He had been scheduled to work that day, but had requested the day off.

Before Mack arrived, the undercover agents attempted to confirm with Bryant that "everybody was on the same page [about what they were doing]." Bryant assured Tyson that Mack "[knew] exactly what [they were] doing" and that "there's no secrets."

Mack arrived in his Miami-Dade police patrol car. He wore his police uniform and badge, but not his name tag. His firearm was visible, holstered at his waist. When Mack arrived, Bryant stated, "James, T." Jackson interpreted this as Bryant introducing Mack by the name "James."

Due to lack of seating at the restaurant, the group decided to move the meeting to another restaurant. Det. Tyson and Bryant rode together in Bryant's vehicle. They were followed by Agent Jackson. Mack met them at the second restaurant. At the new restaurant location, they sat together.

6

During the meeting at that restaurant, which began at about 9:05 a.m., Agent Jackson and Det. Tyson did not mention the words "cocaine" or "drugs." Det. Tyson emphasized that it was important that Mack understood what was going on and that he was "on the same point."[4] Mack did not ask any questions while Tyson was speaking. He gave brief affirmative responses when spoken to, such as, "[t]hat's true," "[r]ight," "[y]ou right," and "[y]eah." He asked no questions.

At some point, while they were still in the restaurant, Mack and Det. Tyson began discussing the county's plan to reduce the police force by laying off hundreds of police officers, to which Tyson replied "[w]e ready to get rich." Tyson also commented that "[n]obody down [in Miami] be working" and that "we" could be in Miami "all the time," and Mack confirmed that "[t]here won't be [anybody working]." Jackson then added that Miami would be "wide open." Mack said nothing in response to that statement.

As the group left the restaurant, Agent Jackson said "[h]ey but I appreciate it man[,]" to which Mack replied "[n]o problem." Jackson told Mack that they were "trying to make it work" because Miami was "new territory for us." He also stated that they had "many t-shirts coming through you know what I mean, we just want to make sure everything is right you know what I mean." Mack responded,

---

[4]That meeting was recorded.

"I don't hate, so that's why I respect and understand everything he mentioned."

Jackson then remarked that "ain't nobody trying to get locked up."  Mack

responded "[y]ou know how they do us" and gestured as though he was

handcuffed, which Jackson interpreted to mean "the government against two black

guys."  The meeting broke up at 10:18 a.m.

Less than two hours later, Bryant arrived at the nightclub with McLendon.

There, McLendon counted ten brick-shaped packages of cocaine as they were

packed into a duffel bag.  There is no evidence that Mack was present when the

packages were counted and packed.  A little after 12:03 p.m., Bryant and

McLendon transported the 10 kilograms of sham cocaine in their car to Aventura.

Their vehicle, a PT Cruiser, was followed closely for about eight to ten miles by

the same marked patrol car that was observed escorting the December 21, 2011

transport.  The marked patrol car kept going behind Bryant and McLendon's

vehicle until it entered a Publix parking lot in Aventura.  FBI agents testified that

throughout the surveillance, there was radio communication between the marked

patrol car and the PT Cruiser.

Bryant, McLendon, and Mack were arrested on April 11, 2012.

All three Defendants were indicted on four counts: (1) conspiracy to possess

with intent to distribute five kilograms or more of cocaine, in violation of 21

8

U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 (Count One); (2) attempt to possess with intent to distribute cocaine on December 21, 2011, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), 846, and 18 U.S.C. § 2  (Count Two); (3) attempt to possess with intent to distribute cocaine on January 14, 2012, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), 846, and 18 U.S.C. § 2 (Count Three);  and (4) possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. §§ 924(c)(1)(A) and 2  (Count Four).

### B.    Procedural History

On September 13, 2012, the government filed a motion *in limine* to exclude testimony at trial concerning Bryant's and Mack's statements at the time of their arrest.  According to the government's pretrial motion, Bryant and Mack each stated to the arresting officers that Mack was led to believe he was escorting money, not cocaine.  The motion does not detail the content of the post-arrest statements, and the government did not attach any copies of said statements. Although there is nothing in the record for us to determine what precisely the statements were, there does not appear to be any dispute that statements of this nature were made.

Mack did not file a pretrial motion for severance.   On the Friday preceding the trial, which began on Tuesday, October 2, 2012, Bryant made additional

9

statements to the prosecutors, asserting that he had led Mack to believe that the transportation involved money, not drugs.  Those statements were not recorded or otherwise made a part of the record.  At the outset of trial, the court granted the government's motion *in limine* to bar Mack's and Bryant's statements to the arresting officers.  The court also ruled that exculpatory statements are inadmissible hearsay.  Mack then orally moved to sever the trials.  The court inquired whether Bryant was going to testify in the joint trial, but Bryant's counsel stated he could not confirm that he would.  The district judge denied the motion as premature, and stated that if Bryant did not testify in the joint trial, Mack could move to sever at that time.  Defense counsel did not offer information that Bryant would testify on Mack's behalf at a separate trial.  Neither did the court inquire whether this would be the case.

The government's case concluded on Thursday, October 4, 2012.  All three Defendants made motions for judgments of acquittal pursuant to Rule 29 on the ground that there was insufficient evidence to prove that they knew what was being transported was cocaine and to prove that any firearms were possessed or carried in connection with the drug transportation.  No renewed severance request was made by Mack.  The court questioned the prosecutor closely concerning the sufficiency of evidence as to Defendant Mack.  She outlined the government's

10

evidence.  At a couple of points the court interjected, expressing some skepticism about whether there was enough evidence to support the government's case against Mack.  At the conclusion of that colloquy, the court denied Mack's motion for judgment of acquittal but stated that "it's a close question."  The court specifically stated, "I assume at the end of the defense case, it will be raised again."  The court then inquired of Mack's counsel "Mr. Rouviere, what are you going to do in front of the jury?"  Mack's counsel stated that ". . . in light of the court's deep analysis of the judgment of acquittal, I would like a couple of minutes to discuss it with my client."  The court stated:  "Oh, I'm not telling you what I'm going to do."  After hearing from counsel for the two other Defendants, who stated that they would not be presenting any evidence, the court inquired again of Mack's counsel who stated his client would not be testifying.  Then the court affirmed with Mack individually that he understood that no witnesses would be called on his behalf and that he had made a decision not to testify in his own behalf.

At that point the jury was brought in and counsel for all Defendants announced that they rested.  After the jury retired from the courtroom, the following colloquy occurred:

> THE COURT: All right.  You're renewing your motions for judgment of acquittal pursuant to Rule 29, right, Mr. Stonick?

11

MR. STONICK:  Correct, Judge, and I'd also restate and renew all previous objections for appellate purposes, if necessary.

THE COURT:  Mr. Rouviere.

MR. ROUVIERE:  Yes, Judge.  I'm renewing my Rule 29 motion and maintaining all prior objections.

THE COURT:  Mr. Walker.

MR. WALKER:  And also, same Rule 29 and maintaining all the prior objections that I made during the course of the trial.

The court denied Bryant's and McClendon's motions.  It announced it would take Mack's motion under advisement, and suggested to Mack's counsel that he file a brief over the long weekend.  We do not construe Mack's reference to "maintaining all prior objections" as a renewed request for severance.

The court recessed until Tuesday, October 9, 2012.  After closing arguments on October 9, 2012, the district court orally denied Mack's Rule 29 motion for judgment of acquittal.

On October 10, 2012, a jury found Bryant and McLendon guilty of all four counts.  Mack was found guilty of Counts One, Three, and Four, but not guilty of Count Two (the attempt charge related to the December 21, 2011 drug transportation).  On October 17, 2012, the district court issued a written order once

12

again denying all Defendants' renewed motions for judgment of acquittal on the ground that the evidence was sufficient to support a jury finding.

On October 17, 2012, Mack filed a renewed motion for judgment of acquittal, or alternative motion for new trial. That motion specifically mentioned the district court's failure to sever Mack's case for trial as a reason to grant a new trial. On the same date, Mack filed a motion for leave to file an affidavit that he anticipated receiving from Bryant, in which Bryant was expected to affirm that he would have provided exculpatory statements for Mack in a separate trial. The court denied both motions in an order entered on October 24, 2012.

On November 12, 2012, Mack filed a second renewed motion for a new trial or in the alternative, motion to alter, amend, or correct order denying motion for a new trial and judgment of acquittal. That motion was also based on the court's denial of severance. An affidavit of Bryant dated November 5, 2012 was attached to the motion. It stated that Bryant had not told Mack that the transaction involved drugs.

On December 18, 2012, McLendon filed a motion adopting Mack's motion for new trial. McLendon subsequently submitted an affidavit of Bryant dated November 15, 2012 concerning McLendon's lack of knowledge that cocaine would be involved in the transaction. Mack's second renewed motion was denied

13

in an order entered on November 15, 2012, and McLendon's motion was denied during the December 19, 2012 sentencing proceedings.

On December 19, 2012, McLendon and Mack were sentenced to 188 and 120 months' imprisonment, respectively, on each of the drug counts they were convicted of, all terms to be served concurrently, followed by 60-months' imprisonment for Count Four, to be served consecutively. The court also imposed a five-year supervised release term on all of the counts, to be served concurrently.

On the same date, after his request for a downward variance based on sentencing factor manipulation was denied, Bryant was sentenced to 204 months' imprisonment for Counts One, Two, and Three, and to a consecutive 60-month term on Count Four, followed by ten years of supervised release on all counts, to be served concurrently.

## II. Issues on Appeal

Defendants challenge the denial of their motions for a judgment of acquittal. Mack appeals the district court's denial of his oral motion made on the first day of trial and of his written post trial motion pertaining to severance. Both Mack and McLendon attack the district court's denial of their respective motions for new trial. All Defendants challenge the district court's failure to admit Bryant's post-arrest statements for impeachment purposes. They further contend that the

14

cumulative effect of purported prosecutorial misconduct, improper government witness testimony, and erroneous judicial rulings warrant a reversal in this case. Only Bryant appeals his sentence.

### III. Sufficiency of the Evidence

#### A.    Standard of Review

All Defendants assert that their convictions were not supported by sufficient evidence. We review de novo the question whether sufficient evidence supports a jury verdict. United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir. 1997) (citing Harris, 20 F.3d at 452). On review of a guilty verdict, "the evidence is viewed in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." Id. The verdict must be upheld "if there is substantial evidence to support it, that is 'unless no trier of fact could have found guilt beyond a reasonable doubt.'" Id. (quoting United States v. Battle, 892 F.2d 992, 998 (11th Cir. 1990)).

We first address the district court's denial of Defendants' Rule 29 motion for acquittal with respect to the conspiracy and attempt charges (Counts One through Three). We then turn to the sufficiency of the evidence on the 18 U.S.C. § 924(c) charge (Count Four). We find that the evidence presented to the jury was sufficient to support Defendants' convictions on all counts.

15

### B.    The Conspiracy and Attempt Charges

The conspiracy charge requires the government to prove beyond a reasonable doubt that: "(1) a conspiracy existed; (2) [Defendants] knew the essential objectives of the conspiracy; and (3) [Defendants] knowingly and voluntarily participated in the conspiracy." Calderon, 127 F.3d at 1326 (quoting Harris, 20 F.3d at 452 (internal quotation marks omitted)). To find Defendants guilty of attempt, the jury had to find beyond a reasonable doubt (1) that they acted with the culpability required for the commission of the crime, and (2) that they took a substantial step toward to the commission of the crime. United States v. Ohayon, 483 F.3d 1281, 1285 (11th Cir. 2007). At issue for both the conspiracy and the attempt charges (hereinafter "the drug charges") is the sufficiency of the evidence that Defendants knew that the transaction involved drugs.

#### 1.    Bryant's Knowledge

The record is rife with evidence of Bryant's knowledge that the contents of the cargo consisted of drugs. On December 9, 2011, Agent Jackson told Bryant "it's ten keys . . . , I mean that's what gonna be moving." Bryant responded, "okay." Jackson repeated himself, to be clear that Bryant understood, "[j]ust so you know. Uh, its ten kilo's." Bryant again said, "okay." Bryant acknowledged

16

that moving the drugs was "a huge risk" and that the police he had recruited to do the job "usually get paid four, five gran' a piece."

Later in the conversation, Agent Jackson stated , "it's not a incre-, incredible amount of cocaine, I mean so it ain't a ton.  Know what I mean?" Bryant replied, "I understand, I understand."  Jackson also said that "cocaine prices isn't what it used to be . . . ."  Bryant hung up when Jackson, on one occasion, referred to the "coke" during a telephone conversation with him, and later chided Jackson for using that term on the telephone.  Bryant suggested that Agent Jackson could use many other terms to refer to cocaine.  There can be no doubt that Bryant knew exactly what he had agreed to transport.  Thus, his conviction on the drug charges must be upheld.[5]

---

[5]Bryant also contends that the "outrageous government conduct" warrants an acquittal. That argument was not presented to the district court.  Issues raised for the first time on appeal are reviewed only for plain error.  See United States v. Kelly, 888 F.2d 732, 739 n.12 (11th Cir. 1989) (a defendant's claim of outrageous government conduct that was not raised at trial is reviewable only for plain error).

An acquittal on grounds that the government engaged in outrageous conduct requires a showing by the defendant that, based on the totality of the circumstances, the government's conduct and over-involvement violated that "fundamental fairness, shocking to the universal sense of justice" mandated by the Due Process Clause of the Fifth Amendment to the United States Constitution.  Wilcox v. Ford, 813 F.2d 1140, 1147 (11th Cir. 1987) (quoting United States v. Russell, 411 U.S. 423, 432, 93 S. Ct. 1637, 1647 (1973) (internal quotation marks omitted)).  The defense can be raised only in the "rarest and most outrageous circumstances." United States v. Tobias, 662 F.2d 381, 387 (5th Cir. Unit B 1981), cert. denied 457 U.S. 1108, 102 S. Ct. 2908 (1982).

According to Bryant, the government's conduct was outrageous because this "egregious reverse sting" involved two drug transportation trips instead of one.  We disagree.  The second run enabled agents to meet and collect evidence against Mack, one of the police officers who

17

### 2.    McLendon's Knowledge

The evidence is ample with respect to McLendon's knowledge that the offense involved drugs.  Bryant stated to Agent Jackson that McLendon would serve as his "point man" to the police officers on the transaction and that he and McLendon have been "in this thing" since they were children.

In addition, McLendon's knowledge of the drugs is supported by independent evidence.  McLendon was present at the nightclub office on December 21, 2011 when Det. Tyson marked each of the nine brick-shaped items, counted them, and placed them in a duffel bag.  Det. Tyson then handed the bag to McLendon and told him that "there's nine in there" and that "[they] need[ed] to make sure all nine of these get there."

McLendon contends that he was not told what was contained in the "opaque, brick-shaped, shrink-wrapped items that were placed in a duffel bag by the undercover agents and given to him and Bryant to transport."  But Det. Tyson instructed both Bryant and McLendon that there can be "no deviation, no test, no taste" and asked "neither one of y'all get high right?"

---

assisted Bryant and who was charged as a co-conspirator.  Thus, the government's decision in conducting two runs, instead of one, was not "fundamentally unfair."

18

McLendon points out that Det. Tyson himself told McLendon and Bryant that they were transporting money, not drugs, by making the statement "cause this money, see what I'm saying?"  However, that statement was made immediately after Tyson had counted the nine brick-like objects and after he had handed the bag to McLendon, cautioning him that they needed to make sure the cargo reaches its destination intact.  Thus, this statement is consistent with Tyson's testimony that he sought to communicate to McLendon and Bryant that the nine kilograms of cocaine were worth a lot of money to him.  In sum, the evidence in the record fully sustains McLendon's conviction on the drug charges.

### 3.    Mack's Knowledge

Mack asserts that there was no evidence from which a reasonable jury could find, beyond a reasonable doubt, that he knew the conspiracy involved drugs, instead of money.  He points out that he was not involved in any of the negotiations or preparations for the offense.  He was not present when the drugs were loaded into the vehicle driven by Bryant and McLendon, and he drove away before they were unloaded.  He never saw the sham cocaine or the bag in which it was carried.  He adds that, on the morning of the second drug transportation trip, the undercover agents were still trying to confirm that he knew that he was escorting drugs.

19

Even though the evidence of Mack's knowledge of the drugs is not overwhelming, it is sufficient to support his conviction on the drug charges. Mack appeared at the January 14, 2012 meeting in full uniform; he was wearing his badge but not his name tag. His weapon was visible and was holstered on his person. Approximately two hours later, FBI agents observed his marked police car following closely the vehicle driven by Bryant and McLendon. We have held that "repeated presence at the scene of the drug trafficking . . . can give rise to a permissible inference of participation in the conspiracy." Calderon, 127 F.3d at 1326 (citations omitted). Although "mere presence," standing alone, is insufficient to support a conviction for a drug-related offense, it is "a material and probative factor" that may be considered by the jury in reaching the verdict. Id. (internal quotation marks and citations omitted); United States v. Baptista-Rodriguez, 17 F.3d 1354, 1374 (11th Cir. 1994).

Mack argues that the "permissible inference" does not apply in his case because he was never present around the drugs and his presence at the scene was not recurring. Contrary to Mack's contentions, a co-conspirator's presence around the drugs involved in the offense is not the only way to trigger the permissible inference. Rather, the inference of participation in the conspiracy can arise from a co-conspirator's presence at meetings related to the conspiracy. See Baptista-

20

Rodriguez, 17 F.3d at 1374 (the defendant challenging the sufficiency of his conviction was present at two "key meetings" involving the conspiracy). In the present case, Mack's presence extends not only to his participation in the January 14, 2012 meeting, but to his subsequent escort of the drugs later that day.[6]

Moreover, the record reflects additional proved circumstances that support the inference of Mack's guilty knowledge. See United States v. Hernandez, 141 F.3d 1042, 1053 (11th Cir. 1998) ("'a conspiracy conviction will be upheld . . . when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him'") (quoting Calderon, 127 F.3d at 1326). We find the conversation between Mack and Agent Jackson to be significant in that regard. The undercover agents told Mack that, as a result of the police officer layoffs, they would be able to do more business in Miami and would "get rich" because Miami would be "wide open." Agent Jackson then confided in Mack that Miami was "new territory" for him and Tyson, and that they had "this many t-shirts coming through you know what I mean, we just want to make sure everything is right you know what I mean." Mack stated that he understood and respected that.

---

[6]Mack was found not guilty of the attempt offense charged in Count Two, which stemmed from the December 21, 2011 drug transport.

21

Although Mack did not say much during the meeting, "[a]n illegal agreement may be inferred from the conspirators' conduct and other circumstantial evidence." Baptista-Rodriguez, 17 F.3d at 1374 (citations omitted) (concluding that the evidence was sufficient to support the defendant's conviction, despite the absence of evidence showing that he verbally assented to the scheme); cf. United States v. Kelly, 749 F.2d 1541, 1548-49 (11th Cir. 1985) (reversing a defendant's conviction of drug-related conspiracy because the defendant's proven involvement in the conspiracy was limited to his presence at another conspirator's house, at which the defendant could have been present as a social guest, particularly where "[n]o evidence exist[ed] that the affairs of the . . . schemes were discussed with [the defendant]").

Mack contends that there is no direct evidence of his knowledge that "t-shirts" is one of the many code words for drugs. However, Agent Jackson, who is an agent on the drug squad, testified that "t-shirts" was a very common word for cocaine "not just [in] Atlanta, . . . but everywhere"; it was also a term he had used with Bryant in reference to the drugs involved in this case. In light of Mack's 16-year experience on the Miami-Dade police force, the jury could reasonably have inferred that Mack knew exactly what Jackson was referring to and that he knew

that the indubitably criminal activity in which he was about to participate involved drugs.

Finally, Bryant made numerous statements to the undercover agents assuring them that Mack knew everything.[7]  These statements likely bolstered the government's case against Mack on the drug charges.  However, they are not necessary to sustain a guilty verdict.  Even absent these statements, the cumulative effect of the circumstantial evidence discussed above is sufficient to show Mack's knowledge of the drugs.[8]

Accordingly, taken in the light most favorable to the verdict, we cannot say that the record reveals a lack of substantial evidence from which a factfinder could

---

[7]These statements include: "They gonna know what's going on because I'm gonna tell them straight out"; "My guys are all on board"; "He knows exactly what we're doing; there's no secrets"; "They ain't talking cheap"; "[H]e knows about it"; "These guys, they know exactly what's going on, 'cause I, I'm straight forward with all of them"; and "They do know."  Agent Jackson did testify, however, that while they were waiting for Mack on the morning of January 14, 2012, Bryant stated that the less the officers knew, the better off they were.

[8]Mack contends that this case is indistinguishable from United States v. Martinez, 83 F.3d 371 (11th Cir. 1996), in which we reversed the convictions on, inter alia, drug charges of one of the defendants (Gomez).  Id. at 377.  Gomez claimed that he was told that he was going to a house to steal money, as opposed to cocaine.  Id. at 374.
     We find Martinez distinguishable.  There, the entirety of the evidence showing Gomez's knowledge of the drugs consisted of a co-defendant's statement to the undercover agents that he (the co-defendant) "had men ready to steal the cocaine [from a house]."  Id.  In contrast, here, even if Bryant had led Mack to believe that he was escorting money, Mack's subsequent conversation with the undercover agents, coupled with his 16 years of experience as a police officer in Miami-Dade County, amounts to sufficient evidence to support Mack's conviction.

find guilt beyond a reasonable doubt.  Calderon, 127 F.3d at 1324.  Thus, we

affirm Bryant's, McLendon's, and Mack's convictions on the drug charges.[9]

## C.    The "Firearms Charge"

18 U.S.C.  § 924(c)(1)(A) provides in part:

> any person who, *during and in relation to any crime of violence or*
> *drug trafficking crime . . .* for which the person may be prosecuted in
> a court of the United States, *uses or carries a firearm*, or who, *in*
> *furtherance of any such crime, possesses a firearm*, shall, in addition
> to the punishment provided for such crime of violence or drug
> trafficking crime . . . be sentenced to a term of imprisonment of [a
> minimum of 5 years].

18 U.S.C. § 924(c)(1)(A)(i) (emphasis added).  Accordingly, to prove the firearms

charge, the government must show that the defendant (1) knowingly used or

carried a firearm during and in relation to any drug trafficking crime for which he

could be prosecuted in a court of the United States, or (2) possessed a firearm in

furtherance of such a crime.  United States v. Woodard, 531 F.3d 1352, 1362 (11th

Cir. 2008); United States v. Haile, 685 F.3d 1211, 1217 (11th Cir. 2012), cert.

denied, 133 S. Ct. 1723 (2013) and cert. denied, 133 S. Ct. 1724 (2013) (stating

that "the enhanced penalties [under the statute] are triggered in one of two ways:

---

[9]Mack does not argue that the evidence was insufficient as to whether he took a substantial step toward the commission of the crime.  The evidence presented to the jury concerning Mack's knowledge of the drugs also supports Mack's conviction on the attempted possession count.

under the 'during and in relation to . . . uses or carries' prong, or under the 'in furtherance of . . . possesses' prong." Id.

All Defendants were charged with carrying a firearm during and in relation to a drug trafficking crime and with possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c) and 2. The district judge instructed the jury on aiding and abetting under 18 U.S.C. § 2 for the section 924(c) charge. The jury found Mack guilty of carrying a firearm during and in relation to the drug trafficking crime, in violation of 18 U.S.C. § 924(c). Bryant and McLendon were found guilty of possessing a firearm in furtherance of the drug trafficking crime, in violation of 18 U.S.C. §§ 924(c) and 2.

### 1. Sufficiency of the Evidence as to Mack

Mack argues that there is no evidence that he carried a firearm during and in relation to the drug trafficking crime. In order to show that a person carried a firearm "in relation to" a crime, the firearm must have "facilitate[d], or [had] the potential of facilitating, the drug trafficking offense"; "its presence or involvement cannot be the result of accident or coincidence." United States v. Novaton, 271 F.3d 968, 1013 (11th Cir. 2001) and United States v. Timmons, 283 F.3d 1246, 1251 (11th Cir. 2002) (both citing Smith v. United States, 508 U.S. 223, 237-38, 113 S. Ct. 2050, 2058-29 (1993)). "The phrase 'in relation to' is expansive."

25

Novaton, 271 F.3d at 1013; see also Timmons, 283 F.3d at 1251-52 (noting that the "during and in relation to" requirement "was intended to be a limiting phrase to 'prevent the misuse of the statute [from] penaliz[ing] those whose conduct does not create the risks of harm [–i.e., combining drugs and guns–] at which the statute aims'") (quoting Muscarello v. United States, 524 U.S. 125, 132, 118 S. Ct. 1911, 1916 (1998)).

We conclude there was sufficient evidence to support Mack's conviction on the firearm charge. It is undisputed that Mack was carrying his firearm approximately two hours before the actual drug transportation. He knew of the illegal nature of the conspiracy, and he understood that his police officer status was a necessary condition to his participation in the deal. In light of this evidence, it was reasonable for the jury to conclude that Mack carried a firearm in relation to the drug trafficking conspiracy.

Mack argues that the firearm had no role in the offense, and that, even if he carried a firearm, it was solely an incident of his wearing his police uniform. Our holding in Novaton defeats this argument. In that case, we found that a police officer, who admitted to carrying his service firearm during the events at issue, "furthered the drug trafficking conspiracy by providing protection for and escorting co-conspirators to and from the Novaton residence while [the co-

26

conspirators] were transporting drugs or drug proceeds." Novaton, 271 F.3d at 1013. Similarly, Mack's carrying his service firearm was necessary to facilitate the drug transportation in the present case, regardless of whether its purpose was to avoid interdiction from law enforcement or also to provide security for the cargo from potential thieves. Even if Mack carried the firearm merely as a necessary accessory to his police uniform, he did so with the recognition that his carrying his "police-issued service firearm," id., combined with his full uniform and his marked police cruiser, would signal to other law enforcement officers that he was one of them—just another police officer on legitimate business. At the very least, the presence of the firearm had the potential for facilitating the conspiracy. See id. (finding that the defendant's police-issued service firearm "facilitated, or had the potential for facilitating" the conspiracy).[10] Accordingly,

---

[10]Mack attempts to distinguish Novaton, in which there was evidence that the officer was responsible for directly protecting the drugs and drug proceeds. See 271 F.3d at 982. Mack asserts that his whole role was limited to driving his police car. Mack's argument misses the mark. It is clear that the evidence of the involvement of the police officer in Novaton exceeded the threshold of proof required to show that the firearm was carried "in relation to" the offense. In the present case, Agent Jackson told Bryant that Jackson wanted uniformed officers in marked police vehicles "in case there was officers that would interdict the loads." Mack's appearance (in full uniform and armed) and his conduct (escorting the drugs according to plan) clearly had the potential for facilitating the offense.

the jury verdict finding Mack guilty of carrying a firearm during and in relation to the drug trafficking crime, in violation of 18 U.S.C. § 924(c), must be upheld.[11]

## 2. Sufficiency of the Evidence as to Bryant and McLendon

Bryant contends that there is no evidence that either he or his co-defendants possessed or carried a firearm. We have already concluded that a reasonable jury could find that Mack carried a firearm on January 14, 2012. Accordingly, Bryant's culpability on the firearm charge turns on proof of his aiding and abetting in Mack's firearm offense under 18 U.S.C. § 2.[12]

18 U.S.C. § 2(a) provides that "[w]hoever . . . aids, abets, counsels, commands, induces or procures [a crime's] commission, is punishable as a principal." 18 U.S.C. § 2(a). To prove aiding and abetting in a section 924(c) case in this circuit, the government must show that (1) the substantive offense was

---

[11]Mack contends that we should analyze the "during" and "in relation to" elements of section 924(c) separately. He argues that there is no evidence that he carried the firearm while he was actually escorting the drugs. Our analysis in Novaton and in Timmons focused exclusively on the "in relation to" requirement because in both of those cases, there was no question that the firearm was carried during the drug trafficking offense. See Novaton, 271 F.3d at 1013 (the defendant admitted that he carried his firearm "during the events involved in this case"); Timmons, 283 F.3d at 1251 ("[t]here is little question that . . . [the defendant carried the firearm "during" the drug trafficking offense] as the gun was sold along with the drugs"). Even though Mack denies carrying his firearm during the actual transportation, it is undisputed that he carried his weapon during the January 14, 2012 meeting; thus, he was armed "during the events involved in this case." See Novaton, 271 F.3d at 1013.

[12]Although there is some evidence in the record suggesting that Bryant may have carried a firearm on January 14, 2012, we affirm the district court's denial of Bryant's Rule 29 motion on an aiding and abetting theory.

committed; (2) that the defendant associated himself with the underlying criminal venture; and (3) that he committed some act that furthered the crime. See Bazemore v. United States, 138 F.3d 947, 949 (11th Cir. 1998) (citing United States v. Hamblin, 911 F.2d 551, 557 (11th Cir. 1990)). In addition, the defendant must have known that a firearm was being used or carried by a co-conspirator. Id.; see also Rutledge v. United States, 138 F.3d 1358, 1359 (11th Cir. 1998).[13]

The United States Supreme Court recently clarified the showing of intent required for conviction of an aiding and abetting violation under section 924(c). Rosemond v. United States, 134 S. Ct. 1240 (Mar. 5, 2014). Rosemond involved a "drug deal gone bad," after either the defendant (Rosemond) or one of his confederates (it was unclear who) fired a gun at the putative drug buyers. Id. at 1243. Rosemond was charged with violating 18 U.S.C. § 924(c) by using or carrying a firearm in connection with a drug trafficking offense, or, in the

---

[13]In Rutledge we phrased the third element of aiding and abetting as a requirement to show that the defendant "committed some act related to the gun," as opposed to some act which facilitated the crime. 138 F.3d at 1359; cf., e.g., United States v. Pareja, 876 F.2d 1567, 1570 (11th Cir. 1989). We derived this requirement from cases discussing the need to link the defendant to the gun. Bazemore, 138 F.3d at 949 (explaining that "section 924(c) does not permit 'guilt by association.'") (citation omitted). In Bazemore, we effectively subsumed the proof necessary to show that the defendant facilitated the carrying of a firearm in the evidence required to establish the defendant's knowledge of the firearm. Id. at 950 ("[O]nce knowledge on the part of the aider and abettor is established, it does not take much to satisfy the facilitation element.") (internal quotation marks and citation omitted). We have held that the "facilitation element" can be met by the defendant "knowingly benefit[ting] from the protection afforded by the firearm." Id.

alternative, aiding and abetting that crime under 18 U.S.C. § 2. Id. At trial, the district judge rejected Rosemond's proposed instructions that a guilty verdict required the jury to find that the defendant "intentionally [facilitated or encouraged the firearm's use], as opposed to [merely] the predicate drug offense." Id. at 1244. Instead, the jury was instructed that Rosemond was guilty of aiding and abetting a section 924(c) offense if "(1) [he] knew his cohort used a firearm in the drug trafficking crime, and (2) [he] knowingly and actively participated in the drug trafficking crime." Id. (internal quotation marks and citation omitted). He was convicted by the jury, and the United States Court of Appeals for the Tenth Circuit affirmed. Id. at 1244-45.

The United States Supreme Court reversed Rosemond's § 924(c) conviction. Id. at 1252. Writing for the majority, Justice Kagan first concluded that the district court correctly instructed the jury that Rosemond could be convicted of aiding and abetting, even if he facilitated only the drug element, not the gun element, of the section 924(c) offense. Id. at 1247-48. Justice Kagan then clarified the proof necessary for the intent element of aiding and abetting a section 924(c) violation—i.e., the defendant's knowledge that a co-conspirator will carry a gun. Id. at 1249. "[The d]efendant's knowledge of a firearm must be advance knowledge"—that is, knowledge at a time when the accomplice "can attempt to

30

alter [the] plan, . . . withdraw from the enterprise[, or] go ahead with his role in the venture."   Id.  An accomplice's knowledge of "a confederate's design to carry a gun" is not "advance" if it does not afford him "a realistic opportunity to quit the crime."  Id.  Accordingly, Justice Kagan concluded that the district court's jury instructions were erroneous because they did not direct the jury to determine when Rosemond obtained the requisite knowledge and to decide whether Rosemond knew about the gun in sufficient time to withdraw from the crime.  Id. at 1251-52.

We are now called upon to determine the effect of Rosemond on the analytical framework employed in cases alleging aiding and abetting a section 924(c) offense.  The literal meaning of the requirement that the defendant's knowledge of the firearm be "advance" is obvious.  In addition, Rosemond's holding that "the affirmative" act or "facilitation" requirement for aiding and abetting a section 924(c) violation is met by the defendant's participation in the drug deal itself and that no act directed to the use of the firearm is required makes clear that the government is not required to show that the defendant "committed some act related to the gun" (as opposed to the substantive offense).  See Rosemond, 134 S. Ct. at 1247-48.

Applying the familiar framework, as modified by Rosemond, to the present case, we have no trouble concluding that the evidence against Bryant and

31

McLendon was sufficient to sustain a guilty verdict for their aiding and abetting in Mack's section 924(c) offense. First, the substantive offense was committed by Mack carrying a firearm during and in relation to the drug trafficking crime.[14] Next, it is evident that Bryant knowingly associated himself with the drug trafficking conspiracy. And, we have already concluded that the evidence showing McLendon's knowledge of the drug transport was sufficient to sustain his guilty verdict. Third, there is ample evidence of various "affirmative acts," by both Bryant and McLendon which furthered the drug conspiracy. Id. at 1247-48. Bryant organized the transportation of large quantities of narcotics and enlisted police officers to assist him. McLendon was the "point man" to the police officers, and he actively participated in the scheme by collecting and dropping off the drugs on two occasions.

Finally, Bryant knew well in advance that a firearm would be carried; in fact, he recruited Mack to participate in the offense based on Agent Jackson's explicit request for uniformed policemen. Mack arrived at the January 14, 2012 meeting in full uniform; his service weapon was holstered at his waist. The

---

[14]While Mack was specifically convicted of carrying a firearm during and in relation to the drug trafficking crime, McLendon and Bryant were convicted of possessing a firearm in furtherance of the crime (on an aiding-and-abetting theory). These verdicts are not necessarily inconsistent. Based on the particular facts in this case the evidence of Mack's conduct supports both types of firearm offense convictions.

32

breakfast ended approximately two hours before Bryant, accompanied by McLendon, picked up the drugs. It is obvious that Bryant had advance knowledge "that enable[d] him to make the relevant legal (and indeed, moral) choice." Rosemond, 134 S. Ct. at 1249.

Unlike Bryant, McLendon was not present at the January 14, 2012 meeting, and could not have observed Mack's openly displayed firearm. Nevertheless, according to the testimony of agents conducting the surveillance, Mack's marked patrol car trailed the vehicle in which Bryant and McLendon were riding, and was either directly behind or a few cars behind it from the moment that vehicle left Miami Beach and drove north to the drop-off location. Furthermore, there was telephone communication between the patrol car and Bryant and McLendon's vehicle throughout the duration of the escort. Accordingly, a reasonable jury could have concluded that McLendon, to whom Bryant referred as his "point man" to the police officers and who was in a vehicle that was loaded with the drugs, believed that the police cruiser following closely over the course of eight or ten miles was driven by an armed police officer.

The question, under the Rosemond test, is whether McLendon's knowledge that Mack was carrying a firearm, was "advance," such that it gave McLendon sufficient time to walk away from the crime. This inquiry implicates the practical

33

difficulties of delineating the exact contours of Rosemond's "advance knowledge" directive.

As to McLendon, we answer the question in the affirmative. After the conclusion of the morning meeting (which McLendon did not attend), Bryant and McLendon jointly collected the drugs that were to be moved. Moreover, McLendon knew that they were transporting drugs that afternoon, that the drugs would be escorted by a police officer (as was the case during the first transportation on December 21, 2011), and that the participation of a uniformed (and likely armed) officer was essential to the success of the drug conspiracy. McLendon had a realistic opportunity to either not enter the vehicle at all, or to exit it before it embarked upon its route. He made a conscious choice to proceed. His knowledge of the gun was sufficiently advance. Compare these circumstances with the illustration in Rosemond involving a defendant in a section 924(c) prosecution who "agrees to participate in a drug sale on the express condition that no one brings a gun to the place of exchange" and whose knowledge is not sufficiently "advance" for purposes of conviction if one of his confederates arrives at the meeting carrying a concealed gun in his jacket. Rosemond, 134 S. Ct. at 1251. As a result, Bryant's and McLendon's guilty verdicts for aiding and abetting in Mack's firearm offense under section 924(c) are affirmed.

34

**IV. Mack's Motion to Sever**

*A.     Standard of Review*

Mack argues that because Bryant's testimony would have contradicted the

government's case and exonerated Mack, the district court's refusal to sever the

trials was an abuse of discretion which deprived Mack of a fair trial.  We review

the denial of a motion for severance for abuse of discretion.  United States v.

Kennard, 472 F.3d 851, 858-59 (11th Cir. 2006).  "Appellate courts are reluctant

to second-guess trial court refusals to grant a severance."  United States v. Pepe,

747 F.2d 632, 650-51 (11th Cir. 1984) (citations omitted).

*B.     Discussion*

Bryant's "exculpatory statements" concern Mack's alleged lack of

knowledge of the contents of the cargo escorted by Mack.  They consist of (1)

Bryant's statements to the arresting officers,[15] and (2) the additional statements he

made to the prosecutors before trial, in which he asserted that Mack was told he

was following cash, not drugs.

At the outset of trial, the court ruled that post-arrest statements "that include

inculpatory statements about other defendants" could not be used in opening

---

[15]Mack also made post-arrest statements averring that he thought he was following cash, not drugs.  Mack's statements to the arresting officers are not at issue here.

statements or otherwise mentioned by counsel.  The district judge cautioned

counsel that failure to abide by the Bruton rule[16] would have dire consequences for

counsel, including contempt sanctions and jail time.  The judge emphasized, on

several occasions, the importance of counsel's compliance with his ruling.  Mack

points to the following colloquy between the district court and counsel for Mack:

> THE COURT: . . . So there will be no mention by a defense lawyer of any statement that inculpates another defendant.  You, of course, can talk about your own client and what he did.
>
> Any question about that?  Unless you want free room and board, that's the way it's going to be.
>
> MR. ROUVIERE: Your Honor, may I address the Court?
>
> THE COURT: Do you understand what I said?
>
> MR. ROUVIERE: I do understand, Your Honor, but that raises --
>
> THE COURT: Then just abide by it.
>
> MR. ROUVIERE: But Judge, it raises another issue that needs to be raised.
>
> THE COURT: I don't want to deal with another issue.  I want to deal with these issues first.
>
> MR. ROUVIERE: Well, it is with this issue, Judge.

---

[16]The Bruton rule bars the admission of incriminating statements made by nontestifying co-defendants at a joint trial.  See United States v. Thayer, 204 F.3d 1352, 1355 (11th Cir. 2000) (explaining the Bruton rule) (citing Bruton v. United States, 391 U.S. 123, 135-36, 88 S. Ct. 1620 (1968)).

36

THE COURT: What didn't you understand about how I ruled?

MR. ROUVIERE: Exculpatory statements made --

THE COURT: I haven't gotten to that yet.

MR. ROUVIERE: Okay.  Well, Judge, it may lead to a motion to sever, because some things happened over the weekend.

THE COURT: . . . . Exculpatory statements cannot come in because they're hearsay.  A defendant's own exculpatory statements made after arrest cannot come in, because it's rank hearsay.
[ . . .]
But you cannot bring in a defendant's inculpatory statement that includes guilt of another defendant, and you cannot bring in a defendant's exculpatory statement.

Any problems with that?  Any misunderstanding?  Because I'm serious about this.  Not only would there be a mistrial, the reason there will be a mistrial is because the lawyer is going to have a lot of time of consultation with a client if the client is in jail.  If the client is not in jail, we're going to have the reverse.  The client is going to have to seek permission to see the lawyer in jail.  So don't violate this when I've been giving you a warning.  Please don't do it.
[ . . . ]

THE COURT: What are you going to say that you think is questionable that may impinge upon your liberty?

MR. STONICK: Nothing, Judge.

THE COURT: Okay.  No, if there is, ask me now because I mean it.

MR. ROUVIERE: Judge, I do have a question.

THE COURT: Okay.

MR. ROUVIERE: A statement from one codefendant exculpating another codefendant --

THE COURT: Can't come in, cannot come in.  It's hearsay.

MR. ROUVIERE: Your Honor, then at this point in time I would –

[ . . .]

MR. ROUVIERE: Your Honor, at this time on behalf of Daniel Mack, I would make a motion to sever Daniel Mack from this trial, and I need to explain to the Court on the record why.

THE COURT: Well, why didn't you do it before?

MR. ROUVIERE: Well, Your Honor --

THE COURT: That's the first thing you need to explain.

MR. ROUVIERE: Well, Your Honor, I sent an email.  I knew that a statement was made post arrest.  However --

THE COURT: What statement?  It can't come in.  Even in a separate trial, it can't come in.

MR. ROUVIERE: Well, Judge, only if I can call the other defendant as a witness in a separate trial.  Because at this time, he has a Fifth Amendment right to remain silent.

THE COURT: And he also has a Fifth Amendment right afterwards.

MR. ROUVIERE: Not if his case is over, Judge.

[ . . . ]

THE COURT: What if he's found guilty?

MR. ROUVIERE: He can still testify, Judge.

38

THE COURT: He can also say, I ain't testifying, I'm going to take an appeal, or I'm not going to testify.

[ . . . ] (discussing the duration of a defendant's appeal and the filing of a petition for writ of certiorari to the United States Supreme Court)

MR. ROUVIERE: Judge, however, apparently on Friday evening, there was a meeting between the Government, the agents, Mr. Bryant wherein in that statement, he made a statement –

THE COURT: In what statement?

[ . . . ]

MR. ROUVIERE: Mr. Bryant made a statement to the Government and the agents that, in fact, my client was told that what was in the car at the time was cash.

THE COURT: Who told him?

MR. ROUVIERE: Mr. Bryant.

THE COURT: So Mr. Bryant says that he told Mr. Mack, . . .

THE COURT: He's following cash.  Okay.

MR. ROUVIERE: Yes, sir.  And that was made in a post arrest statement.  However, now it's been made in a secondary meeting with the Government and I believe Judge under Rule --

THE COURT: Well, is Mr. Bryant going to testify in this trial?

MR. ROUVIERE: I don't know if Mr. Bryant is going to testify.

THE COURT: Have you asked his lawyer?

MR. ROUVIERE: They weren't able to tell me yes or no at this point.

39

THE COURT: Well, how about if I ask him?  Okay.  Mr. Stonick, is your client going to testify?

MR. STONICK: Judge, at this point we reserve our right to testify or not. I cannot indicate if my client will testify.

THE COURT: There you go.  So then you can ask him all you want about that.  Just don't mention it until he testifies.  Resolved.  Motion for severance denied.

The defendant has indicated that he's going to testify.  And then if he doesn't bring it up, you can cross-examine him and even lead him if you want. . . .

[ . . . ]

THE COURT: Do you have a severance motion?

MR. ROUVIERE: An oral one, Judge.  My system has been down.

THE COURT: It doesn't have to be in writing unless you knew before.

What would be the possible grounds?  Defendant says he's going to testify.  You question him.  If he doesn't testify, then you can make it at that point, but as of now, it's denied as premature.

As noted above, Mack's alternative motion for new trial based on the denial of severance and his motion for leave to file an affidavit that he expected to receive from Bryant were filed on October 17, 2012, a week after the conclusion of the trial.  Mack submitted Bryant's November 5, 2012 affidavit to the district court on November 12, 2012, in conjunction with Mack's second renewed motion

40

for a new trial or in the alternative, motion to alter, amend, or correct order denying motion for a new trial and judgment of acquittal.[17]

In this circuit, the rule about joint trials is that "defendants who are indicted together are usually tried together." United States v. Browne, 505 F.3d 1229, 1268 (11th Cir. 2007) (citing, inter alia, Zafiro v. United States, 506 U.S. 534, 537–38, 113 S. Ct. 933, 937 (1993)). "That rule is even more pronounced in conspiracy cases where the refrain is that 'defendants charged with a common conspiracy should be tried together.'" United States v. Lopez, 649 F.3d 1222, 1234 (11th Cir. 2011) (citations omitted).

A severance should be granted if "there is a serious risk that a joint trial

---

[17]In his affidavit, Bryant averred as follows:

1. My name is Henry Bryant and I am a co-defendant in the above styled case and this affidavit is based upon my own personal knowledge.

2. At all times between December 1, 2011 to April 4, 2012, during the events that have lead to this case, I never discussed with Daniel Mack anything about dealing in narcotics or escorting narcotics.

3. Daniel Mack, at all times, was lead [sic] to believe, by me, that the item in the car he was escorting was money and money only.

4. If I was not a co-defendant and my trial had taken place first and had been called to testify at a separate trial for Daniel Mack, I would have testified on behalf of Daniel Mack that he was never advised or told by me that the items he was to escort were narcotics.

5. I presented myself to the AUSA's Waugh and Dwyer Friday, September 28, 2012 before trial and expressed to them that at no time did I ever have any conversation about narcotics with Daniel Mack.

6. Upon my arrest in this case, I advised the agents who interviewed me that I had told Daniel Mack that he was escorting cash for a Miami Beach night club owner.

41

would compromise a specific trial right of one of the defendants." Zafiro, 506 U.S. at 539, 113 S. Ct. at 938. "[A] defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." Id. (citing Tifford v. Wainwright, 588 F.2d 954 (5th Cir. 1979)); see also United States v. Cobb, 185 F.3d 1193, 1197 (11th Cir. 1999) ("To justify severance, the defendant must 'demonstrate that a joint trial will result in specific and compelling prejudice to the conduct of his defense.'") (citation omitted). A defendant's burden of demonstrating "compelling prejudice" stemming from the denial of a motion to sever is a heavy one. Pepe, 747 F.2d at 651.

As part of that "heavy burden," a movant seeking severance in reliance on the exculpatory testimony of a co-defendant must show: (1) a bona fide need for the testimony; (2) the substance of the desired testimony; (3) the exculpatory nature and the effect of the desired testimony; and (4) that the co-defendant would indeed have testified at a separate trial. Novaton, 271 F.3d at 989 (quotation marks and citation omitted). After the defendant makes that showing, the district court must still weigh the significance of the testimony against considerations of judicial economy. Id. Whether severance is proper in light of concerns of judicial administration requires the court to assess (1) the significance of the testimony in

42

relation to the defenses, (2) the extent of the prejudice caused by the absence of the testimony, (3) the effect of severance on judicial economy and the administration of justice, and (4) the timeliness of the motion.  United States v. DiBernardo, 880 F.2d 1216, 1228 (11th Cir. 1989) (quotation marks and citation omitted).

We consider Mack's challenge to the district court's denial of his oral motion made at the opening of the trial in light of the district judge's knowledge of the facts at the time he ruled on the motion.  Byrd v. Wainwright, 428 F.2d 1017, 1018 (5th Cir. 1970).[18]  With that in mind, we turn to the four elements set forth in this circuit's framework for analyzing a motion to sever, and conclude that the first three requirements are met here.

First, it cannot seriously be doubted that Mack had a bona fide need for Bryant's testimony and that Bryant's proposed testimony would have had an exculpatory effect.  Indeed, Mack needed that testimony to contradict the numerous statements confirming Mack's knowledge of the details of the offense which Bryant made to the undercover officers and which were presented to the jury.

_____

[18]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding all decisions of the former Fifth Circuit issued on or before September 30, 1981.

43

As to the substance of Bryant's testimony, we note that, at the time of the motion, a movant is required to make a concrete showing of what the co-defendant would say if he took the stand in a separate trial.  See Pepe, 747 F.2d at 652 (affirming the district court's denial of the defendants' severance motions because, inter alia, the defendants did not "proffer what [the co-conspirator's] testimony would be [if they were tried separately].")  We will assume, for purposes of assessing the specificity of Bryant's proffered testimony only, that Bryant's proposed testimony was reflected in his post-trial affidavit.  The government characterizes the statements contained in that affidavit as "conclusory and self-serving" and as "lacking strong credibility."  As we explained in Novaton, the conclusory nature of an affidavit consists of "bare exculpatory denials [of the charges in the indictment], devoid of any specific exonerative facts."  Novaton, 271 F.3d at 990 (internal quotation marks and citation omitted) (rejecting as "conclusory" the co-conspirator's affidavit that stated only that the police officer who provided protection for the drugs in that case "did not conspire with me, or to my knowledge with anyone else, to possess with intent to distribute cocaine").  Id. By contrast, Bryant's affidavit specifically states that "during the events that have lead to this case, I never discussed with Daniel Mack anything about dealing in narcotics or escorting narcotics," that "Daniel Mack, at all times, was lead [sic] to

44

believe, by me, that the item in the car he was escorting was money and money only," and that Bryant would have testified to that effect in a separate trial. Therefore, the substance of Bryant's proposed testimony is not unduly conclusory.

There are, however, legitimate concerns with respect to the credibility of Bryant's affidavit. That is not because, as the government suggests, the affidavit is utterly devoid of statements contrary to Bryant's penal interest. See Pepe, 747 F.2d at 651 (rejecting an affidavit by a co-defendant that, in addition to being conclusory, was "of dubious credibility because it was in no way contrary to [the co-defendant's] own [penal] interests"); see also Novaton, 271 F.3d at 990-91 (same). Rather, two other facts substantially undermine the credibility of the statements contained in Bryant's affidavit: (1) he did not submit the affidavit until the trial was over; and (2) he submitted a similar affidavit in favor of McLendon, even though Bryant's statements to the arresting officers and to the prosecutors concerned only Mack's knowledge.[19]

---

[19]As to McLendon, Bryant's affidavit states that, during the events at issue, Bryant did not discuss with McLendon anything about drugs. Bryant also avers that he led McLendon to believe he was transporting money, and that he would have testified to that effect in a separate trial. From this point on, the contents of Bryant's affidavit as to McLendon begin to differ from those submitted in support of Mack's motion. Specifically, Bryant affirms that he told his attorney "numerous times" that he never discussed transporting drugs with McLendon. He further states that, upon his arrest, he advised the agents that he had "told [his] alleged Co-Defendants [(without mentioning McLendon's name)] that they believed it was cash for a Miami Beach Night Club owner." In contrast, in the affidavit that he submitted for Mack, Bryant specifically states that he made the exculpatory statements to the arresting officers *and* the prosecutors concerning Mack's knowledge (emphasis added).

Notwithstanding our observations, we need not decide whether the "dubious credibility" of Bryant's affidavit is outcome determinative with respect to Mack's motion to sever. This is so because Mack has not shown that he established a likelihood Bryant would have testified in a separate trial.

A movant "must establish . . . that the designated co-defendant will in fact testify at a separate trial." United States v. Morrow, 537 F.2d 120, 135 (5th Cir. 1976). "Movant . . . need only demonstrate a 'likelihood' of future testimony by his co-defendant . . . . " Id. n.9 (citations omitted); see also Cobb, 185 F.3d at 1199 ("Our concern with whether a co-defendant will testify for the defendant in a separate trial is limited to determining whether the co-defendant is *likely* to testify, not whether he is certain to do so.") (emphasis in original) (citations omitted). "The court is not required to sever where the possibility of the codefendant's testifying is merely colorable"; the possibility of such testimony must be "more than a gleam of possibility in the defendant's eye." Byrd, 428 F.2d at 1022.

It is clear from the transcript of the October 2, 2012 jury trial proceedings that Mack's counsel did not advise the district court judge that Bryant would testify for Mack in a separate trial. Instead, counsel engaged in a theoretical debate with the district court over whether a defendant, whose trial was over, could testify for a co-defendant in a separate trial. Counsel then brought Bryant's

46

statement to the prosecutors to the court's attention.  At no time did counsel state

or even imply that Bryant would, or might, testify for Mack at a separate trial.  Cf.

Cobb, 185 F.3d at 1199-1200 (reversing the district court's denial of the

defendant's motion for severance because the co-conspirator's counsel stated that

he was willing to testify on the defendant's behalf in a separate trial, even though

his own conviction was awaiting appeal).  While the statements (or lack thereof)

of Mack's counsel at the outset of the jury trial reflected a "merely colorable"

possibility that Bryant may testify in a separate trial, they fall short of establishing

a likelihood of such testimony.[20]

Apparently relying on Cobb, 185 F.3d 1193, Mack faults the district court

for not inquiring sua sponte whether Bryant would testify for Mack in a separate

trial.  In Cobb, we considered the district court's inquiry whether the co-

conspirator would be willing to testify on the defendant's behalf only to examine

the district court's interpretation of the co-conspirator's offer to testify "as

---

[20]Mack's contentions that the mere existence of Bryant's statements to the arresting officers and to the prosecutors establish a likelihood of future testimony in a separate trial are unsupported by any authority.  In addition, United States v. Martinez, 486 F.2d 15 (5th Cir. 1973) upon which Mack relies is inapposite.  There, our predecessor court quoted an observation made by the United States Court of Appeals for the Fourth Circuit that "'a severance is obligatory where one defendant's case rests heavily on the exculpatory testimony of his co-defendant, *willing to give such testimony* but for the fear that by taking the stand in the joint trial he would jeopardize his own defense.'"  Martinez, 486 F.2d at 23 (quoting United States v. Shuford, 454 F.2d 772, 776 (4th Cir. 1971)) (emphasis added).  In the present case, at the time of the motion, it was by no means clear that Bryant was willing to testify in the joint trial; in fact, Bryant's counsel stated that he could not indicate if his client would testify.

conditioned on [the co-conspirator's] case being tried first." Id. at 1198.  Nothing in Cobb supports Mack's sweeping presumption that any part of the burden in a motion to sever, that is specifically allotted to the movant, see Novaton, 271 F.3d at 989, should be shifted to the district judge.  Similarly, Mack's reliance on certain language contained in Byrd is misguided.  See Byrd, 428 F.2d at 1019 n.1 (remarking that there may be error if, "in a sufficiently extreme case of prejudice, [the trial judge fails] on his own motion to reopen the question of severance, where, after denial, the circumstances have sufficiently changed").  In the present case, the circumstances concerning the likelihood of Bryant's testimony in a new trial did not change conclusively until November 12, 2012—the date on which Mack filed his second renewed motion for a new trial, along with Bryant's affidavit.  This was a full month after the conclusion of the joint trial.  Cf. id. at 1019 (discussing events that occurred at the trial).

The district court did ask whether Bryant was going to testify in the joint trial.  The judge noted that if Bryant did testify, his statements could be addressed during cross-examination, and that if he did not take the stand, Mack could make his motion to sever at that time.  Mack did not renew his motion to sever during the trial.  His alternative motion for new trial based on the denial of severance was filed a week after the jury returned a guilty verdict.  Cf. Cobb, 185 F.3d at 1197

48

(where the district court denied the defendant's motion on the morning of the trial and the defendant renewed it at the close of the government's case).  Importantly, Mack did not even file his motion for leave to file an affidavit until a week after the conclusion of the trial.  And, he did not produce Bryant's affidavit until a month after he had filed the motion for leave.  Cf. Pepe, 747 F.2d at 650 (where the district court noted that there was "some likelihood" that the co-defendants would testify for the defendant based on the co-defendants' affidavits from their grand jury testimony); and Byrd, 428 F.2d at 1022 (noting that "[t]he unsupported possibility that (exculpatory testimony of a co-defendant) might be forthcoming does not make the denial of a motion for severance erroneous") (internal quotation marks and citation omitted); see also United States v. Neal, 27 F.3d 1035, 1047 (5th Cir. 1994) (holding that the defendants demonstrated that a co-defendant would have testified on their behalf in a separate trial when that co-defendant submitted an affidavit in favor of the defendants and "extensively testified in camera" that one of the defendants did not participate in the controlled substance conspiracy).

Because Mack has not made the requisite showing that severance in the present case was proper, we need not address the judicial economy considerations.  We feel compelled to point out, however, that, were we to examine those factors,

49

we would have grave doubts whether Mack's motion to sever was timely.  Even though Bryant's statements to the prosecutors were made on the Friday before the trial, his motion was based, in part, on his statements to the arresting officers, of which counsel for Mack knew well in advance of trial.  Counsel conceded that "[he] knew a statement [that Mack was told by Bryant that he was following cash] was made post arrest."  The district judge inquired whether counsel for Mack had filed a severance motion and invited him to explain why he had not done so.  After the judge stated that "[the motion] doesn't have to be in writing unless you knew before," he considered, and ultimately denied, counsel's oral motion.

Mack correctly points out that the district court did not deny his motion on timeliness grounds, although he easily could have done so, in light of counsel's advance knowledge of the statements to the arresting officers.  See Cobb, 185 F.3d at 1200 (noting that the district court would likely have been justified in finding that the severance motion was untimely because the defendant amended his initial motion, which was filed well before trial, with his intention to seek the  co-conspirator's exculpatory statement on the morning of trial).  Although we held in Cobb that a district court's failure to deny a motion for severance on untimeliness grounds requires us to review the district court's decision on the merits, id., the circumstances in the present case are distinguishable.  The district court apparently

50

assumed that counsel had just learned of the grounds underlying the motion (i.e., Bryant's statements to the prosecutors). Thus, he did not question counsel's failure to file a motion to sever based on Bryant's statements to the arresting officers, and counsel did not bring this omission to the court's attention.

Our comments on the timeliness of Mack's motion only buttress our conclusion that this is not "one of those rare cases," in which the defendant raises "a compelling argument that he suffered 'prejudice resulting in the denial of a fair trial flow[ing] from the failure to grant the motion' for severance." Cobb, 185 F.3d at 1197-98 (concluding that the defendant presented such an argument where the sole evidence against him consisted of another defendant's testimony). Accordingly, we hold that district court did not abuse its discretion by denying Mack's motion to sever.

### V. Mack's and McLendon's Motions for New Trial

As noted, one week after the trial, Mack renewed his motion for judgment of acquittal, or alternative motion for new trial based on the denial of severance. After that motion was denied, Mack filed a second renewed motion for a new trial, or in the alternative, motion to alter, amend, or correct order denying motion for a new trial and judgment of acquittal. McLendon also filed a motion, adopting

51

Mack's motion to overturn the jury verdict and to grant a new trial.[21]  In support of their respective motions, both Mack and McLendon presented the aforementioned affidavits from Bryant.  Mack and McLendon challenge the district court's denial of their respective motions for new trial.

### A.    Standard of Review

This court reviews the denial of a motion for new trial for abuse of discretion.  United States v. Campa, 459 F.3d 1121, 1151 (11th Cir. 2006).

### B.    Discussion

To succeed on a motion for a new trial based on newly discovered evidence, the movant must establish that (1) the evidence was discovered after trial, (2) the failure of the defendant to discover the evidence was not due to a lack of due diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to issues before the court, and (5) the evidence is such that a new trial would probably produce a different result.  United States v. Gates, 10 F.3d 765, 767 (11th Cir. 1993), modified on reh'g in part, 20 F.3d 1550 (11th Cir. 1994) (citation omitted).  "The failure to satisfy any one of these elements is fatal to a motion for a new trial."  United States v. Lee, 68 F.3d 1267, 1274 (11th Cir. 1995) (citation omitted).

---

[21]McLendon did not join in Mack's oral motion to sever that was made at the outset of trial.

52

The subject evidence in the instant case was not discovered after trial. The defense knew of the substance of Bryant's exculpatory statements as early as the government's pretrial motion *in limine* and Mack's oral motion to sever made on October 2, 2012, the first day of the trial. See DiBernardo, 880 F.2d at 1225 (reiterating that newly-available exculpatory testimony of a co-defendant is not synonymous with newly discovered evidence sufficient to grant a Rule 33 motion where the defendants benefitting from the exculpatory testimony were well aware of the proposed testimony prior to trial); cf. Gates, 10 F.3d at 767-68 (concluding that the "newly discovered" evidence requirement was met when the defendant did not discover until six months after the trial that his co-conspirator would exculpate him, and where there was no evidence in the record that the defendant "knew or had access to knowledge that [the co-conspirator] would exculpate him").

The defense argues that DiBernardo is distinguishable because it involved a pretrial affidavit. 880 F.2d at 1219. But both Mack and McLendon knew of the substance of Bryant's exculpatory testimony prior to the inception of the trial. Mack's counsel argued at the sentencing proceedings on December 19, 2012 that he made the oral motion to sever on the first day of trial because "we had believed that Mr. Bryant would testify as he did when he was arrested and as he also did in the meeting with the Government the Friday night before the trial . . . ." Similarly,

53

during the same proceedings, McLendon's counsel stated that he joined in Mack's oral motion to sever "when we were doing our pretrial arguments for the reason that clearly Mr. Bryant could have been a witness [. . . and] because I was under the impression that he might be able to get an exculpatory [affidavit]." Furthermore, in his motion for leave filed only a week after the joint trial was over, Mack stated that he anticipated obtaining an affidavit from Bryant regarding Mack's lack of knowledge of the drugs. This timing further buttresses Mack's and McLendon's knowledge of the proposed testimony before the trial was over. Thus, the exculpatory statements in Bryant's affidavits do not qualify as "newly discovered" evidence for purposes of Rule 33.

In addition to Mack's and McLendon's failure to show that the evidence was discovered after the trial, we are not persuaded that Bryant's proposed testimony would probably produce a different outcome in McLendon's case. Gates, 10 F.3d at 767.[22] A jury might not be receptive to Bryant's proffered testimony, which is inconsistent with the multiple statements he gave to the undercover agents. As already noted, the credibility of Bryant's proposed testimony is further called into question by his failure to refer to both Mack and

---

[22]We make no determination in this regard in Mack's case.

54

McLendon in, at least some of, his post-arrest statements.[23]  See id. at 768

(cautioning that "post-trial exculpatory statements given by a convicted

co-defendant must be viewed with care" because "a jury might find [the

co-defendant] to be not a credible witness").

Because Mack and McLendon have not shown that Bryant's statements

were "newly discovered evidence" and that they would probably lead to a different

outcome, at least in McLendon's case, we do not address the other elements

required to establish entitlement to a new trial.

## VI. The District Court's Failure to Admit Bryant's Exculpatory Statements

Mack[24] asserts that Bryant's post-arrest statements regarding Mack's lack of

knowledge of the drugs were admissible, under Federal Rule of Evidence 806, to

impeach Bryant's inconsistent co-conspirator statements to the undercover agents.

The problem for Mack and McLendon is that they never presented this argument

to the district court.

### A.    *Standard of Review*

---

[23]In his affidavit in support of McLendon's motion for new trial, Bryant does not state, as he did with respect to Mack, that he told the prosecutors that he had never discussed drugs with McLendon.

[24]In his brief, McLendon also challenges the exclusion of Bryant's exculpatory statements as to Mack, and adopts the arguments made by Mack on that issue.  McLendon argues that the exculpatory statements would have established Mack's innocence, which in turn would have vitiated the grounds for McLendon's conviction of the firearm charge.

55

A district court's evidentiary rulings are generally reviewed for abuse of discretion. United States v. Baker, 432 F.3d 1189, 1202 (11th Cir. 2005). Absent contemporaneous objection to evidentiary matter, "we do not apply the customary abuse of discretion standard"; rather, we limit our review to "a search for 'plain error.'" Calderon, 127 F.3d at 1334; see also United States v. Sorondo, 845 F.2d 945, 949 (11th Cir. 1988) ("the plain error rule must apply when, as here, a party states an inaccurate objection just as when a party states no objection at all").

"Plain error occurs where (1) there is an error; (2) that is plain or obvious; (3) affecting the defendant's substantial rights in that it was prejudicial and not harmless; and (4) that seriously affects the fairness, integrity, or public reputation of the judicial proceedings." United States v. Johnson, 694 F.3d 1192, 1195 (11th Cir. 2012) (internal quotation marks and citation omitted).

### B.    Discussion

Federal Rule of Evidence 806 states:

When a hearsay statement -- or a statement described in Rule 801(d)(2)(C), (D), or (E) -- has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness. The court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it. If the party against whom the statement was admitted calls the declarant as a witness, the party may examine the declarant on the statement as if on cross-examination.

56

FED. R. EVID. 806.

The record shows that numerous out-of-court statements made by Bryant to the undercover agents were entered into evidence and used by the government to establish Mack's guilty knowledge. We have no difficulty concluding that Bryant's post-arrest statements—that he told Mack that they were transporting money and that he had never discussed narcotics with Mack—were inconsistent, as required by Rule 806, with the recorded statements (which were played for the jury), in which Bryant said that Mack "knows exactly what we're doing" and which were used to convict Mack of the drug charges. See United States v. Grant, 256 F.3d 1146, 1153-55 (11th Cir. 2001).[25]

It bears repeating that the discussion at the opening of the trial concerning Bryant's remarks to the arresting agents and the prosecutor was general and

---

[25]We agree with Mack that Grant, 256 F.3d 1146, which involved a drug trafficking conspiracy, squarely resolves the inconsistency issue here. In Grant, we considered a challenge to the district court's refusal to admit a co-conspirator's exculpatory affidavit introduced by the defendant (Wilson) for impeachment purposes. The district court had found that the statements in the affidavit were not sufficiently inconsistent with the co-conspirators inculpatory statements admitted through the testimony of a Customs Service agent. Id. at 1153. We disagreed, and concluded that the government had used Wilson's co-conspirator statements to establish the existence of a conspiracy, and the statements in Wilson's affidavit were "inconsistent with the existence of any conspiracy at all, and for that reason were inconsistent with his co-conspirator statements." Id. at 1154-55.

Similarly here, the prosecution used Bryant's statements admitted through the agents to demonstrate that Mack knew the conspiracy involved drugs. Bryant's post-arrest statements directly contradict Bryant's statements to the undercover agents concerning Mack's knowledge of the drugs.

57

hypothetical in nature. There was no formal proffer of evidence or offer of a stipulation. Thus, Bryant's counsel had no opportunity to object. We are not at all confident that Bryant's counsel would not have objected to any mention of his (Bryant's) prior statement to the jury because the statements are at least mildly inculpatory as to Bryant—he was telling the agents and the prosecutor that he had never told Mack that drugs would be involved in the deal; only cash would be involved. The question which must be asked is: how would Bryant know what was going to be involved in the deal unless he was himself culpable? Finally, we note that there was no formal tender of evidence for the district court to rule on. Mack has failed to demonstrate plain error by the district court.

## VII. Defendants' Cumulative Error Argument[26]

Defendants contend that a number of instances of prosecutorial misconduct, combined with improper government witness testimony and erroneous judicial rulings, amount to a cumulative error, impairing their fair trial and due process rights under the Fifth and Sixth Amendments to the United States Constitution and warranting reversal of the jury verdict.

### A.    *Standard of Review*

The question whether cumulative errors have deprived the defendant of a

---

[26]This argument, raised by McLendon, was also adopted by Mack and Bryant.

fair trial is reviewed de novo. United States v. Dohan, 508 F.3d 989, 993 (11th Cir. 2007) (citation omitted). "In addressing a claim of cumulative error, we must examine the trial as a whole to determine whether the [defendant] was afforded a fundamentally fair trial." Calderon, 127 F.3d at 1333 (citation omitted).

## B.    Discussion

In order to establish cumulative error warranting reversal, each incident must constitute error in itself. United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004) ("If there are no errors or a single error, there can be no cumulative error.") (internal quotation marks and citation omitted). We consider (1) whether each complained of incident constitutes error; and (2) if so, whether the cumulative effect of all errors mandates a reversal.

### 1.    Prosecutorial Misconduct

"'To find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant.'" United States v. Epps, 613 F.3d 1093, 1100 (11th Cir. 2010) (quoting United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991)). "[R]emarks prejudicially affect the substantial rights of the defendant when they 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'" Eyster, 948 F.2d at 1206 (citation omitted).

59

Defendants contend that the prosecutorial misconduct in this case consists of, inter alia, the following burden-shifting statements:

(1) In its closing argument, the government commented on the lack of evidence that Mack and McLendon believed they were transporting money (as opposed to cocaine), and that Mack was just trying to help a friend move money.

(2) In its rebuttal closing argument, the government denigrated defense counsel and characterized Mack and McLendon's defense of "lack of knowledge" as a "red herring."

(3) At the very conclusion of its rebuttal, the prosecutor stated:

> Finally, ladies and gentlemen, all three defense counsel dealt with this instruction here. And they said: Proof beyond a reasonable doubt is proof so convincing that you would be willing to rely and act on it without hesitation in the most important of your own affairs.
> [. . . ]
> I think an important affair in life would be the choice to transport drugs. That's life changing. You could go to jail for a very long, very short time, who knows. But it could maybe take you away from your family. But it could also bring you riches. That's one of the most important of your own affairs. Am I going to act legally or am I going to act illegally? . . .

(followed by McLendon's counsel objecting and the court overruling the objection). The prosecutor continued by stating:

> The most important of your own affairs was the choice to bring a co-conspirator and not a witness.
> [. . .]
> The most important affairs of your life, ladies and gentlemen, were those choices that Henry Bryant made. Those actions, ladies and gentlemen,

60

coupled with all of the other recordings prove beyond a reasonable doubt that all three of these men are guilty.

McLendon again objected to these comments, and his objection was again overruled.

During closing arguments, "prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence." United States v. Simon, 964 F.2d 1082, 1086 (11th Cir. 1992) (citation omitted). However, "prejudice from the comments of a prosecutor which may result in a shifting of the burden of proof can be cured by a court's instruction regarding the burden of proof." Id. (citations omitted).

There is no error as to the first and second "burden-shifting" statements. The government prefaced its statement that no evidence was presented concerning Mack's and McLendon's knowledge that the transport involved money by stating:

> *The defendant has no burden whatsoever.* He doesn't have to produce any such evidence, but there's no evidence in this case that Daniel Mack thought they were transporting money. That's speculation. That's conjecture, and reasonable doubt is not speculation. It's not conjecture.

(emphasis added).

However, in the third instance, the district court improperly overruled the objection by McLendon's counsel because the prosecution asked the jury to equate

61

their own situation to Defendants' respective situations.  However, the court properly instructed the jury on the burden of proof, and nothing in the record indicates that the jury disregarded the court's instructions.  See  Simon, 964 F.2d at 1087 ("a prejudicial remark may be rendered harmless by curative instructions to the jury") (internal quotation marks and citations omitted).  Accordingly, there is no reason to think that the remarks prejudicially affected the substantial rights of Defendants.

### 2.    Improper Government Witness Testimony

We turn next to Defendants' enumeration of incidents involving improper government witness testimony.

(1) Agent Jackson "vouched" for the government during his testimony about the "disappearance" of the sham cocaine when he stated: "I don't know where it's at. . . . I'm sure the FBI has it in custody. We don't let kilograms of cocaine walk . . . I'm sure it could be provided."

Defense counsel did not object at the time of the "improper vouching."  In addition, defense counsel asked Agent Jackson about the whereabouts of the sham cocaine six times (in one form or another), even after Jackson had already told counsel that he himself did not know where the sham drugs were and that counsel would have to direct that question to the case agent.  This is not the kind of

"improper vouching taint[ing] the trial" that we have held may constitute a reversible error. See Eyster, 948 F.2d at 1207-08 (reversing based on the prosecutor's improper vouching for the credibility of a government witness).

(2) Det. Tyson testified that "you would never see money packaged in that manner," even though he acknowledged that his prior investigatory experience is in drug trafficking, not money laundering. The court overruled defense counsel's objection on the basis of Tyson's experience in other undercover drug deals. The court then pointed out that the defense could cross-examine Tyson as to his experience in money laundering operations. We find no error.

(3) Det. Tyson criticized defense counsel in front of the jury when counsel questioned him about his statement to McLendon and Bryant that "this [is] money." Counsel finds the following statement by Tyson to be objectionable: "[s]ee, what we have, ladies and gentlemen, the attorney is trying to say that –."

A careful review of the transcript shows no improper criticism of the defense counsel by the agent or by the court. Defense counsel objected to Tyson's statement as being "not responsive to the question." When the court attempted to clarify what the question was, defense counsel withdrew the question. There is no error.

### 3.    Erroneous Judicial Rulings

63

Two of the three judicial rulings challenged by Defendants concern the district court's exclusion of Bryant's post-arrest statements and the denial of Mack's motions to sever and for new trial and of McLendon's motion for new trial. We have previously found no abuse of discretion as to those two rulings as discussed in Parts IV, V, and VI.

The final purportedly erroneous judicial ruling concerns the cross-examination of Agent Jackson concerning Taurus Barron. Barron was an unindicted police officer who was involved in escorting the transportation of sham cocaine during the same period as Defendants. Defendants argue that the district court restricted Jackson's cross-examination concerning Barron's purported statements to other law enforcement officers that Barron was told he was escorting money, not drugs.

We conclude that the district court did not improperly restrict Agent Jackson's cross-examination concerning statements made by Barron. The transcript shows that defense counsel asked Jackson whether he knew that Barron asserted that he was told the transportation involved cash. The government objected on the grounds of hearsay. The court asked defense counsel whose statements counsel wanted to introduce. Counsel stated that he was talking about "the statement of the other police officers," and Jackson confirmed that he was

64

present at the time the statement was made.[27]  The court then inquired of the prosecutor whether she had introduced a "statement of that agent," to which she responded that she had only introduced statements made by Jackson and Tyson. After confirming with defense counsel that the statements he was attempting to introduce were not Jackson's or Tyson's, but were in fact Barron's, the court sustained the hearsay objection.  We find no abuse of discretion.

Defense counsel then proceeded to question Jackson about Jackson's knowledge concerning whether Barron had ever been charged in the case.  Jackson stated that he did not know because he did not conduct surveillance during the operation and was not involved in any arrests in the case.  The government objected to that line of questioning because any additional answer Jackson could have given would have been hearsay.  The court properly sustained the objection.

In sum, most of the purported errors enumerated by McLendon are not errors at all.[28]  The cumulative effect of the sole remaining error involving the

---

[27]Despite defense counsel's use of the plural form, it does appear that defense counsel was referring to Barron's statement concerning his knowledge, not that of other police officers.

[28]This conclusion applies to the following additional incidents briefly mentioned by Defendants.  First, Defendants highlight the prosecutor's comment in opening statement: "[I]f anyone watches t.v., you see cocaine. It's packaged in a brick form, kilogram square form, wrapped in tape."  Although this comment was not proper, there was no objection, and no harm was done.
    Second, Defendants point to Agent Jackson's testimony as to defendant Bryant's "belief" and "knowledge" concerning the drugs.  As Defendants point out, however, the district court did sustain the motion to strike as well as the ensuing objection by Bryant's counsel, and the

65

prosecutor asking the jury to put themselves in Defendants' positions does not come close to requiring a reversal.

## VIII.  Bryant's Sentence

### A.    Standard of Review

We review the reasonableness of a sentence under an abuse of discretion standard.  United States v. Kuhlman, 711 F.3d 1321, 1326 (11th Cir. 2013).  The abuse of discretion standard "allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment."  Id. (internal quotation marks and citation omitted).

### B.    Discussion

Bryant first argues that his 264-month total sentence is procedurally unreasonable because the court denied his motion for a downward departure below the applicable 248- to 295-month range based on the government's sentencing factor manipulation.  He further argues that his total sentence is substantively

government discontinued the line of questioning concerning Bryant's "belief" and "knowledge."

Third, the government elicited testimony from Det. Tyson about the value of cocaine without establishing any foundation for Tyson's knowledge.  Defense counsel did not object to Tyson's statement, and we find no error.  See United States v. Costa, 691 F.2d 1358, 1361 (11th Cir. 1982) (testimony from an experienced D.E.A. agent regarding the street value of cocaine is not prejudicial error, even in light of the failure to qualify the agent as an expert).

Finally, Defendants object to the prosecutor's attempt to clarify to whom Bryant was referring when he told Jackson "[w]e've been in this thing together for ⸺since we've been eight years old."  Defense counsel's objection was overruled.  A close review of the transcript reveals that the prosecutor's question concerned Agent Jackson's understanding of Bryant's statement.  Thus, the district court did not err in overruling defense counsel's objection.

66

unreasonable because it is excessive.

The sole basis of Bryant's procedural unreasonableness claim is that the government engaged in sentencing factor manipulation when it conducted the reverse-sting operation in an outrageous and reprehensible manner. Bryant submits that the government's conduct was outrageous because of the large amount of sham cocaine that was used and the fact that the agents allowed Bryant to complete a second run instead of arresting him after the first one.

We have never vacated a sentence based on alleged sentencing factor manipulation. See United States v. Docampo, 573 F.3d 1091, 1097-98 (11th Cir. 2009) (reiterating that courts in this circuit have yet to "recognize[] a defense of sentencing factor manipulation or [to] permit[] its application") (citations omitted); see also United States v. Ciszkowski, 492 F.3d 1264, 1271 (11th Cir. 2007) (listing examples of conduct held not to constitute sentencing factor manipulation).

Bryant acknowledges that the authority in this circuit weighs heavily against his position. Moreover, he concedes that the government's conduct in this case does not amount to sentencing manipulation under this circuit's precedent. See United States v. Sanchez, 138 F.3d 1410, 1414 (11th Cir. 1998) (the government's decision as to the drug quantity in a sting operation does not amount to sentencing

67

manipulation); Ciszkowski, 492 F.3d at 1271 (the government did not engage in sentencing manipulation when it provided a defendant with a silencer-equipped firearm in a sting operation involving murder-for-hire, although the gun triggered a mandatory 30-year minimum sentence where the gun or the silencer was not completely unrelated to the criminal act).  Nevertheless, Bryant argues that we should reconsider our position and "set limits on how far the government may go to create crimes and prosecute people."  Bryant cites no authority, nor can he, in support of that argument, and he fails to explain why his case warrants such a shift.  Accordingly, his "procedural" challenge to his sentence is rejected.

Bryant's 264-month total sentence is also substantively reasonable.  It is near the low end of the applicable 248- to 295-month total range, as well as the low end of the underlying Sentencing Guidelines sentence.  Thus, this court would ordinarily expect the sentence to be reasonable.  See United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008) (a sentence falling within the Guidelines range is not automatically presumed to be reasonable; however, such a sentence ordinarily is expected to be reasonable).  In addition, Bryant's sentence is well below the statutory maximum penalty of life imprisonment—another indication that it is reasonable.  United States v. Gonzalez, 550 F.3d 1319, 1324 (11th Cir. 2008).

Finally, the record shows that the district court considered the section

68

3553(a) factors and the facts of the case, and declined to vary below the

Guidelines range, stating:

> [a]fter having heard from all parties and having adopted the
> guidelines. . . I don't think a sentence below the guideline is
> appropriate at all. So my question here is, where within the guidelines
> between 188 and 235 months [on Counts 1-3] I should sentence the
> defendant. I'm not going to go below the guidelines to 180 months,
> because I don't think it would be appropriate in the exercise of my
> discretion.
> But by the same token, the top of the guidelines with the other 60 months
> would be 24 years and 7 months, I think that's too much under the facts of
> this case, and it doesn't really serve the interest of society under 3553(a).

The seriousness of Bryant's criminal conduct supports that decision: he

organized the transportation of large quantities of serious narcotics, and enlisted

police officers to assist him.  Moreover, he did so as an active public servant

whose job was to protect the public, not to foster criminal elements within it.  In

light of the foregoing, Bryant's bare assertion that his guidelines-range sentence is

excessive is insufficient to demonstrate an abuse of discretion by the court.

Accordingly, the district judge did not abuse his discretion by denying Bryant's

request for a downward variance, and Bryant's sentence is affirmed.

## IX. Conclusion

We affirm the district court's denial of Defendants' Rule 29 motions, and

affirm Defendants' convictions.  We also affirm the district court's denial of

Mack's motion to sever and of Mack's and McLendon's motions for new trial.

69

We hold that the district court's refusal to admit Bryant's post-arrest statements for impeachment purposes does not constitute plain error. We further find no cumulative error warranting reversal. Finally, we affirm the district court's denial of Bryant's request for a downward variance and affirm Bryant's sentence.