[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10010

_____

D.C. Docket No. 1:12-cr-20276-FAM


UNITED STATES OF AMERICA,

Plaintiff - Appellee,


versus


HENRY LEE BRYANT and
OCTAVIUS MCLENDON,

Defendants - Appellants.


_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(July 3, 2019)


Before JORDAN, GRANT, and BALDOCK,* Circuit Judges.

_____

* Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting by
designation.

BALDOCK, Circuit Judge:

In October 2012, a jury convicted Defendants Henry Bryant and Octavius McLendon each of multiple drug charges and a gun charge. After trial, the Government disclosed to Defendants that an undercover FBI agent who investigated Defendants and testified against them at trial was under investigation himself for obstructing an unrelated murder investigation and maintaining an improper relationship with a former FBI confidential source. Based on this new information, Defendants filed motions for a new trial. After an evidentiary hearing, a magistrate judge issued a thorough Report and Recommendation (R & R) recommending that Defendants' motions be denied. The district court adopted the R & R in Defendants' cases and denied the motions. Defendants timely appealed. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

In 2012, the FBI received a tip that a Miami Beach fire inspector was extorting the owner of Club Dolce, a nightclub in Miami Beach. The FBI began investigating this matter, with FBI Agent Matthew Fowler as the lead agent, and began running part of its operation out of Club Dolce with the owner's permission. An FBI undercover coordinator determined FBI Agent Dante Jackson "fit the persona of a nightclub manager" and referred him to Agent Fowler for the case.

2

Agent Jackson became the primary undercover agent, posing as Club Dolce manager "Kevin Johnson."

Agent Fowler testified that during the code compliance investigation, "there was always this underlying theme that . . . there's all this other corruption going on . . . ." Doc. 257, at 106–07. In light of the potential for additional corruption, as the code compliance case was winding down, Agent Fowler and another case agent began brainstorming different ideas on how "to weed out . . . corruption in Miami Beach." *Id.* at 106. Agent Fowler testified that at this point the investigation turned into a "drug investigation." *Id.* at 104.

In this drug investigation, Agent Fowler remained the lead case agent, meaning it was his job to "start[] the initial investigation[,] . . . come up with a plan, go over specific targets, [and] work the investigation to get to a prosecution." *Id.* at 87. Agent Jackson remained in his undercover role as Club Dolce manager Kevin Johnson. Another undercover officer, FBI Task Force Officer KayTee Tyson III, joined the investigation. Tyson posed as Kevin Johnson's drug-trafficking friend "Tony Woods" or "T" from the Northeast who needed people to transport drugs in the Miami area and needed police cover for the transport. Although only Agent Jackson and Officer Tyson participated in undercover roles, numerous other FBI agents assisted in this investigation.

3

In his undercover capacity, Agent Jackson presented the drug-trafficking plan to Defendant Bryant, a Miami Beach fire inspector whom Agent Jackson met a couple months earlier in the code compliance investigation.  Agent Jackson explicitly told Defendant Bryant they initially needed to transport "ten keys" of "cocaine."  Government Exhibit 53 at Tab C, Transcript of 12/9/11 Meeting at 20. Defendant Bryant agreed and recruited others, including Defendant Octavius McLendon and Miami-Dade police officer Daniel Mack, to participate. Eventually, two transports occurred on December 21, 2011, and January 14, 2012. Both times, Agent Jackson loaded bricks of sham cocaine into a duffel bag in the office of Club Dolce in Defendants' presence; Defendants took and transported the bag to the agreed upon location; a marked police car followed closely behind Defendants' car during the transport; and Defendants returned to the office to get paid.  Neither Bryant nor McLendon carried a gun during the transports, although there was evidence Mack, who was the police escort during at least one of the transports, carried his gun during the transport.[1]

Defendant Bryant, Defendant McLendon, and Mack were arrested and charged with conspiracy to possess with intent to distribute cocaine (Count 1); attempt to possess with intent to distribute cocaine on December 21, 2011 (Count

---

[1] The parties are aware of the facts surrounding the transports of sham cocaine and the evidence presented at trial.  We will refer to this evidence only as it becomes relevant below.  For a full rendition of the evidence presented at trial, see Doc. 291, at 11–29.

4

2); attempt to possess with intent to distribute cocaine on January 14, 2012 (Count 3); and possession of a firearm in furtherance of drug trafficking (Count 4). After a four-day jury trial in October 2012, the jury convicted Defendants on all four counts and convicted Mack on Counts 1, 3, and 4. Defendant Bryant, Defendant McLendon, and Mack received total terms of imprisonment of 264 months, 248 months, and 180 months, respectively. All three appealed their convictions, arguing among other things the evidence was insufficient on all counts. The Eleventh Circuit affirmed. *United States v. Mack*, 572 F. App'x 910 (11th Cir. 2014) (unpublished).

*   *   *

As it turns out, the investigative team aiming "to weed out . . . corruption" included an agent with his own integrity issues: Agent Jackson. Unbeknownst to the rest of the team and the FBI, Agent Jackson maintained an improper relationship with a former FBI confidential source and ex-Russian mobster, Mani Chulpayev. In March 2014, after Defendants' direct appeal was briefed but before the Eleventh Circuit ruled on it, the Government notified Defendants' attorneys that Agent Jackson was under investigation for allegations arising out of his relationship with Chulpayev. After the appeal concluded, Defendants sought additional information about the Jackson investigation. In July 2015, the Government responded that the Department of Justice Office of the Inspector

5

General ("OIG") received a complaint in March 2013, "which alleged that Jackson obstructed an ongoing murder investigation." Doc. 182-2, at 1. The OIG also received allegations "that Jackson had unauthorized contacts with a closed confidential source, accepted gifts from the closed source, and engaged in other potential criminal and administrative violations involving the closed source." *Id.* Agent Jackson was under investigation for these allegations but, at that point, "there [had] been no findings of misconduct or other impropriety." *Id.* at 2.

Armed with this information, all Defendants filed a motion for a new trial pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and Fed. R. Crim. P. 33. The magistrate judge held an evidentiary hearing, and during this hearing, OIG investigator Susan Howell testified to the following facts about Chulpayev and Agent Jackson's misconduct. Mani Chulpayev was "involved in a bunch of crimes" in the late 1990s in New York. Doc. 257, at 170. The FBI arrested him for these crimes around 1998, after which Chulpayev began cooperating with the government and became a registered FBI source. He moved to Atlanta and assisted the FBI there, until he was arrested for vehicle-related crimes. When he was released from prison, he expressed to an FBI agent that he wanted to cooperate with the government again. In January 2010, Chulpayev became a registered FBI source once again, and Agent Jackson became Chulpayev's FBI "handler." In

6

February 2011, however, Chulpayev stopped being a registered FBI source because he was leaving the Atlanta area.

Agent Dante Jackson's Chulpayev-related misconduct, which occurred after Chulpayev was no longer a registered source, falls into two categories: (1) receiving improper gifts from Chulpayev and (2) improperly intervening on Chulpayev's behalf. At the evidentiary hearing, the Government did not contest that Agent Jackson received multiple items of value not related to his performance of undercover FBI work, including Miami Heat tickets on four occasions, a room at the Fontainebleau Hilton Hotel, use of an Audi A8 for three days, and a $3500 payment to Agent Jackson's credit card covering the majority of a $4256.12 charge from Bamboo Nightclub. Additionally, the Government did not contest that Chulpayev provided Agent Jackson with work-related items of value, including Heat tickets on one occasion and the use of luxury vehicles on twelve occasions. Howell testified that, as a result of his connections, Chulpayev also provided Agent Jackson with discounts on shoes, jewelry, and lunches at an Italian restaurant. On another occasion, Chulpayev provided Agent Jackson with $1500 cash as a part of an investigation, and Chulpayev was eventually reimbursed. These actions violated FBI policy.

In addition to receiving gifts from Chulpayev, Agent Jackson also attempted to intervene on Chulpayev's behalf with regard to his serious legal issues—both of

which relate to Chulpayev's luxury vehicle "business." Agent Jackson's first intervention on Chulpayev's behalf concerns an agreement Chulpayev entered into with Amanda Smith. Smith acted as a straw purchaser for Chulpayev and bought luxury vehicles. Smith then allowed Chulpayev to lease the cars, and Chulpayev would pay Smith the monthly car payment plus an extra fee for Smith. Chulpayev eventually stopped paying Smith, prompting Smith to hire an attorney. Agent Jackson contacted Smith's attorney. At some point, Smith's attorney told Agent Jackson he knew Chulpayev was an FBI source, he knew Chulpayev was involved with vehicle fraud, and he would report Chulpayev and Agent Jackson. According to Smith's attorney, Agent Jackson then told him, "If you do that, I'll have you arrested for extorting a federal agent." These actions, of course, violated FBI policy.

Jackson intervened a second time on Chulpayev's behalf regarding a far more egregious legal issue, which began at Chulpayev's birthday party on June 2, 2012, in Miami.[2] One of Chulpayev's drug-trafficking friends, Decensae White, attended the party. White told Chulpayev that Melvin Vernell III, an Atlanta-based rapper also known as "Lil' Phat," stole marijuana from White. At some point, White asked Chulpayev if Vernell was in one of Chulpayev's cars. As an investor

---

[2] Howell testified to the following information based on Sandy Springs Police Department's interviews of Chulpayev.

in Chulpayev's business, White knew Chulpayev's cars had GPS trackers in them. Chulpayev told White that Vernell was in his car and gave White either the coordinates to where Vernell was located or the login information to access the car's location. On June 7, as Vernell waited in a hospital parking garage while his girlfriend had her baby, Vernell was murdered in a car he was leasing from Chulpayev. Chulpayev later testified that when he gave the information to White, he did not think White would kill Vernell.

The next day, Chulpayev called Sandy Springs Police Department to give them information about White's potential involvement in the murder, but the officer did not call Chulpayev back or was not interested. Chulpayev then called Agent Jackson and told him that he thought White and White's associate Gary Bradford were involved in Vernell's murder. Agent Jackson instructed Vernell to not talk to anyone about the murder. On June 11, Agent Jackson called the Sandy Springs Police Department and told Detective J.T. Williams that his "source" told him that White and Bradford might be involved in the murder. Detective Williams wanted to interview the source, but Agent Jackson told Detective Williams that he was very protective of his source. Agent Jackson also told Detective Williams narcotics were involved and that it could become a federal case.[3]

---

[3] White and Bradford were under FBI investigation at this point for drug trafficking. Jackson served as the case agent on this investigation, and Officer Tyson was undercover for this investigation.

At some point, Agent Jackson indicated to Detective Williams that Chulpayev gave White the coordinates to the hospital where Vernell was murdered. Detective Williams asserted that would make Chulpayev a co-conspirator in the murder. Upon hearing this, Agent Jackson attempted to recover by saying actually Chulpayev gave White the coordinates to where Vernell was staying. In October 2012, Agent Jackson provided Chulpayev to Detective Williams for an interview. This interview eventually led to Chulpayev's arrest for his involvement in the murder.[4] In January 2013, Agent Jackson called Detective Williams to confess that Chulpayev was no longer a registered FBI source and that he had not been one for a while. Detective Williams reported this disclosure up his chain of command, and the Sandy Springs Police Department eventually notified the FBI. At the time of the evidentiary hearing, the OIG's investigation was still ongoing, but Jackson was no longer actively working for the FBI.

\* \* \*

After the evidentiary hearing and further briefing on the foregoing information about Jackson's misconduct, the magistrate judge issued a thorough

---

[4] After spending two years in jail, Chulpayev won a motion to suppress certain statements he made regarding Vernell's murder. *State v. Chulpayev*, 770 S.E.2d 808 (Ga. 2015). He then pleaded guilty to a lesser charge and was released.

10

R & R addressing Defendants' *Brady* claims and Rule 33 motions.  For the *Brady*

claim, Defendants had the burden to show:

> (1) the government possessed favorable evidence to the defendant[s];
> (2) the defendant[s] [did] not possess the evidence and could not
> obtain the evidence with any reasonable diligence; (3) the prosecution
> suppressed the favorable evidence; and (4) had the evidence been
> disclosed to the defendant[s], there is a reasonable probability that the
> outcome would have been different.

*United States v. Stein*, 846 F.3d 1135, 1145–46 (11th Cir. 2017).  The R & R stated

Defendants satisfied their burdens on the first three *Brady* elements.  As to the

fourth materiality element, the R & R stated neither Defendant Bryant nor

Defendant McLendon satisfied their burden.  The R & R engaged in a similar

analysis as to Defendant Bryant's and Defendant McLendon's Rule 33 claims.

The R & R stated Mack, however, satisfied his burden and was entitled to a new

trial on all counts for which he was convicted.  Lastly, the R & R stated that even

though Defendant Bryant and Defendant McLendon were convicted of the § 924(c)

charge on an aiding and abetting theory and Mack was entitled to a new trial on the

§ 924(c) as the principal, the court should deny Defendant Bryant's and Defendant

McLendon's motions for a new trial on their § 924(c) charges.

On December 16, 2016, the district court adopted the R & R in Defendant

Bryant's and Defendant McLendon's cases.  The district court, however, deferred

ruling and required further oral argument in Mack's case.  On April 21, 2017, the

Government and Mack entered into a Joint Resolution Agreement, whereby

Mack's § 924(c) conviction would stand but the Government would dismiss the other counts against Mack.  In a written order, the district court accepted this agreement and explicitly stated it was not adopting the magistrate judge's R & R.

## II.

Defendants Bryant and McLendon appeal the district court's order adopting the magistrate judge's R & R, arguing the district court erred in two ways.  First, Defendants argue that because the magistrate judge recommended that Mack be granted a new trial on the § 924(c) charge, Defendants are entitled to a new trial on that charge as well.  Mack was charged as the principal of the § 924(c) charge, while Defendants were charged on an aiding and abetting theory.  Defendants argue "the alleged 'principal' has been granted a new trial and so also should the alleged 'aiders.'"  Op. Br. at 38.  Fatal to this claim, however, is the fact that Mack was *not* granted a new trial on the § 924(c) charge.  The Government and Mack agreed that Mack's § 924(c) conviction would stand, and the district court entered an order to this effect.  Although the district court adopted the R & R in Defendants' cases, the district court never adopted the R & R in Mack's case.  Instead, the district court's order accepting the Joint Resolution Agreement explicitly states it was not adopting the R & R in Mack's case.  This first argument, therefore, fails.

12

Second, Defendants argue the district court erred in determining the withheld evidence—information about Agent Jackson's improper relationship with Chulpayev—was not material under *Brady*. We review this determination *de novo*. *United States v. Scheer*, 168 F.3d 445, 452 (11th Cir. 1999). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). Notably, the materiality test under *Brady* is not a sufficiency of the evidence test. *Kyles*, 514 U.S. at 434–35.

At the outset, we note Agent Jackson's conduct—while egregious—was not related to the instant case. Although this fact is not in itself dispositive, it is highly relevant and worth emphasizing. No facts regarding Agent Jackson's misconduct overlap with the facts leading to Defendants' prosecutions. Both Officer Tyson and OIG Investigator Howell testified Chulpayev was not involved in this case. Agent Fowler, the one in charge of the drug investigation, had not even heard of Chulpayev prior to OIG's investigation of Jackson. The information, therefore,

13

would not have been admitted as substantive evidence at Defendants' trial. The timing of Agent Jackson's conduct, however, is relevant to how its disclosure might have affected the proceedings. While Agent Jackson did not receive a majority of the gifts from Chulpayev until after the trial in this case, a few gifts were received before and during trial. Specifically, Agent Jackson received Heat tickets on one occasion and used Chulpayev's luxury vehicles on six occasions prior to Defendants' trial, and Jackson used Chulpayev's 6 series BMW during Defendants' trial in which Agent Jackson testified. Agent Jackson's interventions on behalf of Chulpayev, which possibly could severely undermine his credibility, occurred after the investigation but before trial. Therefore, had this information been disclosed to Defendants, they could have potentially used the information to impeach Agent Jackson.

Defendants take it a step further and argue that, not only could this information have been used as impeachment evidence, but it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Op. Br. at 39 (citing *Arnold v. McNeil*, 622 F. Supp. 2d 1294, 1316 (M.D. Fla. 2009), *aff'd and adopted sub nom. Arnold v. Sec'y, Dep't of Corr.*, 595 F.3d 1324 (11th Cir. 2010)). Defendants also argue the disclosure "would have caused the government to refrain from calling Jackson as a witness altogether." Op. Br. at 50. The disclosure would have perhaps prevented Jackson from

14

testifying, but even so, we do not agree that the disclosure would have "put the whole case in such a different light as to undermine confidence in the verdict." In *Arnold*, the district court held a jury verdict was unworthy of confidence when an investigator, who was the only person able to confidently identify the defendant, engaged in egregious misconduct around the same time he was testifying against the defendant at trial. 622 F. Supp. 2d at 1316–18. The critical distinction between *Arnold* and the instant case is that here, Agent Jackson was not the sole source of vital information at trial. Almost every interaction Agent Jackson testified about at trial was also recorded. In other words, in sharp contrast to the investigator in *Arnold*, there is very little for which the jury had to take Jackson's word because they heard the recordings themselves. The relevant exception is the initial meeting Agent Jackson had with Defendant Bryant about the drug-transporting plan, in which Agent Jackson testified that the recording device failed. This initial meeting will be discussed more below.

## A.

Keeping in mind that the alleged *Brady* material—Agent Jackson's misconduct—was unrelated to this case and most of Agent Jackson's trial testimony was corroborated by recordings, we first consider the effect the disclosure of Agent Jackson's misconduct would have on Defendant Bryant's drug convictions. Defendant Bryant barely makes any argument that there is a

reasonable likelihood of a different result, perhaps because of the overwhelming evidence against him. To state just one example of the evidence against Defendant Bryant, the jury heard a recording of Agent Jackson telling Defendant Bryant "what's gonna be moving" is "ten kilos." Government Exhibit 53 at Tab C, Transcript of 12/9/11 Meeting at 7–8. They also heard Agent Jackson tell Defendant Bryant they were "dealing with ten keys," which Agent Jackson stated was "not a incre-, incredible amount of *cocaine*." *Id.* at 20 (emphasis added). Defendant Bryant's response was "Okay" and "I understand, I understand." *Id.* Defendant Bryant ended up transporting "nine" on December 21, 2011, and then another ten wrapped in similar packaging on January 14, 2012. These facts were evident from, not only the recordings, but also Officer Tyson's testimony. To the extent Agent Jackson's trial testimony corroborated this evidence, it was cumulative. The likelihood of a different result, had Agent Jackson's misconduct been disclosed, is not nearly great enough to undermine our confidence in the jury verdict regarding Defendant Bryant's drug convictions.

## B.

We now turn to the effect such disclosure would have had upon Defendant McLendon's drug convictions. At trial, McLendon argued he did not have the requisite intent for the drug-trafficking crimes because he thought they were transporting money rather than cocaine. Even though there was no evidence that

16

the word "cocaine" was used in McLendon's presence, the jury did not accept this defense and found McLendon guilty.  Now, McLendon essentially argues that without Agent Jackson's testimony, there is a reasonable probability the jury would have believed his defense that he thought he was transporting money.  Specifically, McLendon argues "Jackson's repeated opinions that McLendon was talking about drugs was the damaging part of the evidence for the jury."  Op. Br. at 45.

In their opening brief, Defendants point to two of such occurrences that involve understanding McLendon's comments.  First, the jury heard a recording of McLendon expressing that he did not want to use the SunPass lane during the transport "[c]ause it takes pictures."  Government Exhibit 53 at Tab F, Transcript of 12/21/11 Meeting at 9.  The Government then asked Agent Jackson what he understood that comment to mean.  Agent Jackson responded, "He didn't want any evidence of the actual *drug transaction*."  Doc. 145, at 74 (emphasis added).  He also stated McLendon "didn't want to get on the SunPass lane fearful that the cameras on the SunPass lane would take pictures of the car with them in it with the cocaine."  *Id.*  Second, the jury heard a recording of McLendon stating something about them "not using the same pattern."  *Id.* at 81.  The Government asked Agent Jackson what his understanding of the comment was, and Agent Jackson responded that McLendon meant "they would change the officers out for *each*

17

*subsequent deal* that we did."[5]  *Id.* (emphasis added).  In parentheticals in their reply brief, Defendants point to additional occurrences that involved Agent Jackson's understanding of McLendon's recorded comments.  Specifically, Defendants note that "Jackson characterizes meeting with McLendon as 'the actual drug deal'"; "Jackson opines McLendon meant to say 'when you're carrying 10 kilograms of cocaine, you want the bag to be as small as possible . . .'"; and "Jackson opines it was 'everybody's plan' that the job involved cocaine."  Rep. Br. at 13–14 (citing Doc. 145, at 72, 95, 107).

Agent Jackson's comments at trial about McLendon's involvement in "the actual drug transaction" or "each subsequent deal," however, were not nearly the only evidence that established McLendon knew they were transporting drugs. First, Agent Jackson explicitly told Bryant they were transporting "cocaine." Bryant recruited "his brother" McLendon to help with the job.  McLendon argues Agent Jackson and Bryant originally planned to transport money and apparently

---

[5] Defendants also give the example of when the jury heard a recording of Bryant saying he had "been in this thing together" (assumedly with McLendon) since they were eight years old.  Doc. 145, at 44.  At trial, the Government asked Jackson what he understood by that comment. Describing this moment, Defendants now state that "Agent Jackson thereby turned 'this thing' into cocaine trafficking . . . ."  Op. Br. at 12.  Defendants must not understand that we, too, read the record, which reveals Agent Jackson did *not* "turn[] 'this thing' into cocaine trafficking."  *Id.* Rather, Agent Jackson testified he understood it to mean, "Just that they were partners. They've just been together since they were eight years old, just partners, family."  Doc. 145, at 44.  When pressed further, Jackson said, "I just understood it to mean they were partners. I mean, they were just in it together."  *Id.*  Absent from Jackson's answers is any mention of drugs, let alone "cocaine trafficking."

Bryant did not tell McLendon of the change of plans. To support this argument, McLendon points to one sentence of Jackson's trial testimony, in which he described the first meeting with Bryant where the recording device failed:

> I discussed with Mr. Bryant that I had an associate in New York who was a childhood friend that was involved in drug trafficking. I was laundering his money through the nightclub, and he had proposed a deal to me to assist him with laundering some drug proceeds, and in exchange, I would be paid for that.

Doc. 145 at 14. Bryant was "fine" with this proposal. *Id.* Agent Jackson's very next statement about this first meeting, however, describes the plan:

> *The initial plan was to transport the drugs from a point in Miami to another destination*, and he would provide police officers to assist with *escorting the drugs*. The whole thing I presented to him was I didn't want the drugs being picked up by police, so we wanted police escorts to make sure the drugs made it from Point A to Point B.

*Id.* at 15 (emphases added).[6] Unfortunately for McLendon, had Agent Jackson's misconduct been disclosed, Agent Jackson might not have testified at all and there would have been no money-laundering testimony. Thus, McLendon would have had even less of a basis for arguing he thought he was transporting money. Even if this same testimony was elicited, however, it is unclear whether Jackson expected Bryant to launder money. What is clear is Agent Jackson needed to "transport the

---

[6] Defendants state that in this conversation, Jackson never "impl[ied] that he or his Club Dolce were involved in the Maryland drug trafficking." Op. Br. at 7. This statement is only correct insofar as Jackson did not mention the state of Maryland—a fact of no consequence. The statement is otherwise incorrect, as Jackson did not only imply he was involved in drug trafficking, he *stated* he was involved and needed help escorting the drugs.

drugs" and Bryant "would provide police officers to assist with escorting the drugs."[7] If any doubt remained, later recorded conversations make clear they were transporting "cocaine."  Given there was a plan to transport "cocaine" and Bryant recruited McLendon to help execute this plan, the evidence is strong that McLendon knew they were attempting to transport cocaine.

Second, McLendon in fact showed up for both transports, where he watched Agent Jackson load wrapped "bricks" of sham cocaine into a duffel bag. McLendon clearly saw and counted the bricks.  He completed the transports and returned to the office to receive his payment.  While McLendon argues that the packaging of the sham cocaine was consistent with the packaging of money, Tyson testified at trial that he had "never" seen money packaged the way the sham cocaine was packaged in this case.  *Id.* at 202–03.  He explained: "When you're delivering money to anyone, people want to make sure that what they're getting there is money."  *Id.* at 202.  In his experience—which includes eight years on the FBI's Safe Streets Task Force "investigat[ing] large drug trafficking organizations," *id.* at 187–88—one package like what McLendon and Bryant transported usually represents one kilogram of cocaine or heroin.  *Id.* at 203.

---

[7] Agent Fowler—the case agent who came up with the plan—testified at the hearing on the motion for a new trial that the plan all along was to "move the drugs through the club" and that money laundering was never a part of the plan.  Doc. 257, at 137–39.

Third, during the December 21 transport before Defendants took the duffel bag, Tyson asked Defendants, "No deviation, no taste, no test, neither one of y'all get high right?"  Government Exhibit 53 at Tab G, Transcript of 12/21/11 Meeting at 11.  Defendants were "insulted" at the comment and McLendon responded only with "Pstt."  *Id.*; Doc. 145, at 196.  Tyson's comment simply would not have made sense had Defendants thought they were transporting money, as money is not "tasted" or "tested" even figuratively.  Further, Tyson explained the meaning of this interaction at trial.  He testified that he "didn't want a person that gets high to transport my drugs for me, because at that point they could decide to go in, take some more, test it for themselves to see what it was, if it was good, if it wasn't."  Doc. 145, at 196.  In light of the evidence showing McLendon thought he was transporting cocaine, Agent Jackson's multiple statements at trial about McLendon thinking he was participating in a "drug transaction" or "deal" were not crucial enough to put the whole case in such a different light as to undermine our confidence in McLendon's drug convictions.  Therefore, had Agent Jackson's misconduct been disclosed, there is not a reasonable probability that the result of the proceeding would have been different.

## C.

Lastly, we turn to the effect the disclosure of Agent Jackson's misconduct would have had on Defendants' gun convictions.  Although in their header

Defendants indicate their argument is about the effect of the disclosure of Agent Jackson's misconduct "on all Counts," Defendants write only one sentence in this section about the gun charges, which refers back to section A of their brief. Op. Br. at 38, 49–50 ("[F]or both Bryant and McLendon, because the district court correctly found that Jackson's testimony to find Mack's guilty knowledge was key to the verdict on the § 924(c) count, a new trial on the § 924(c) charge is required is [sic] to all the defendants (as explained in section A, above)."). Section A of their brief, however, only makes the argument that as a matter of law, it is inconsistent for Mack to receive a new trial as the principal and McLendon and Bryant to not receive a new trial as the aiders and abettors. We have already addressed this argument above. *See supra* pp. 10–11. Not once do Defendants make the separate argument that, had Agent Jackson's misconduct been disclosed, there is a reasonable probability that the result of the proceeding in regard to Defendants' gun convictions would have been different or engage in the fact-specific analysis required to make this argument. We, therefore, do not address this issue.

Agent Jackson's unethical conduct was not worthy of an FBI agent. For the foregoing reasons, however, his misconduct was not material because the likelihood of a different result in Defendants' cases had the misconduct been

disclosed is not great enough to undermine our confidence in the jury's verdict.

Accordingly, we **AFFIRM**.